## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALICE RADEN and BOBBIE MOORE, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>MARTHA STEWART LIVING OMNIMEDIA, INC., a Delaware corporation, and MEREDITH CORPORATION, an Iowa corporation.<br><br>          Defendants. | Case No.: 16-cv-12808<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Alice Raden and Bobbie Moore bring this Class Action Complaint and Demand for Jury Trial against Defendants Martha Stewart Living Omnimedia, Inc. and Meredith Corporation to obtain redress for all persons injured by their intentional and unlawful disclosure of Plaintiffs' and a proposed Class of subscribers' sensitive and statutorily protected information. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE CASE

1.      Defendant Martha Stewart Living Omnimedia, Inc. is a media and entertainment company that's best known for its eponymous "Martha Stewart"

1

branded publications. Defendant Meredith Corporation is also a media company and publishes some of the most widely circulated magazines in the United States, including *Better Homes and Gardens* and *Family Circle*. Defendants jointly work together to market and sell Martha Stewart's *Martha Stewart Living* magazine.

2.      Unfortunately for their subscribers, Defendants supplement their sales and advertising revenues by secretly selling their statutorily protected information—including their full names, the title of the magazine they subscribed to, and home addresses (collectively "Personal Reading Information")—to data miners and other unrelated third party companies. Defendants also trade their subscribers' Personal Reading Information with other data miners and aggregators for the purpose of "appending" (*i.e.*, supplementing) their customer files with other highly sensitive data about them, such as e-mail addresses, age, gender, and household income. By enhancing their customers' Personal Reading Information in this way, Defendants are able to increase the "street value" of their customer lists and sell or trade them at a higher premium.

3.      In order to facilitate their surreptitious multi-million dollar disclosure business, Defendants hide their practices from their subscribers, and neither notify them nor obtain their permission before disclosing their Personal Reading Information to unrelated third parties.

4.      Defendants' disclosure practices squarely violate Michigan's

Preservation of Personal Privacy Act, M.C.L. §§ 445.1711–15—a broad consumer protection statute popularly referred to as the Video Rental Privacy Act ("VRPA"). The VRPA prohibits companies like Defendants from disclosing—without written permission—any information that specifically identifies a person as having purchased written materials, such as magazines.

5.      Accordingly, Plaintiffs Raden and Moore bring this Complaint against Defendants for their intentional and unlawful disclosure of their subscribers' Personal Reading Information in violation of the VRPA, as well as for their unjust enrichment from such practices.

## PARTIES

6.      Plaintiff Alice Raden is a natural person and citizen of the State of Michigan.

7.      Plaintiff Bobbie Moore is a natural person and citizen of the State of Michigan.

8.      Defendant Martha Stewart Living Omnimedia, Inc. is a Delaware corporation with its principal place of business located at 601 West 26th Street, New York, New York, 10001. Martha Stewart Living Omnimedia is also registered to conduct business in the State of Michigan (as Michigan Department of Licensing and Regulatory Affairs ID Number 634577). Martha Stewart Living Omnimedia conducts business throughout this District, the State of Michigan, and

the United States.

9.    Defendant Meredith Corporation is an Iowa corporation with its

principal place of business located at 1716 Locust Street, Des Moines, Iowa 50309.

Meredith is also registered to conduct business in the State of Michigan (as

Michigan Department of Licensing and Regulatory Affairs ID Number 600259).

Meredith conducts business throughout this District, the State of Michigan, and the

United States.

## JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over Defendants because they are

registered to, and regularly do, conduct business in this District, including by

soliciting business from, and entering into transactions with, consumers located in

this District. Further, the unlawful conduct alleged in the Complaint occurred in,

was directed at, and/or emanated in part from this District.

11.    This Court has subject matter jurisdiction over this action pursuant to

28 U.S.C. § 1332(d) because at least one Class member is a citizen of a State

different than Defendants, the amount in controversy exceeds $5,000,000,

exclusive of interest and costs, and none of the exceptions under that subsection

apply to this action.

12.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a

substantial part of the events and omissions giving rise to the claim occurred in this

4

District. Venue is additionally proper because Plaintiff Raden resides within this District and Defendants conduct significant business in this District, including soliciting consumer business and entering into consumer transactions here.

## FACTUAL BACKGROUND

### I.     An Overview of the VRPA.

13.     In 1988, after the public disclosure of then-Supreme Court nominee Robert Bork's (and his family's) video viewing records, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into [their] loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

14.     Congress responded by passing the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA")—which, as enacted, regulates a certain type of business (a "video tape service provider") and a narrow subset of consumer information (that is, "information which identifies a person as having requested or obtained specific video materials or services"). Although this statute initially also sought to "protect[] the selection of books that [consumers] read," 134 Cong. Rec. S5399 (May 10, 1988), the final version of the VPPA was limited to video

5

materials. *See* 18 U.S.C. § 2710.

15.     The Michigan Legislature, however, decided that the federal VPPA didn't go far enough, and expressed concern that Michigan consumers' "choice[s] in reading, music, and video entertainment [were] a private matter, and not fit for consideration by gossipy publications, employers, clubs, or anyone else." H.B. No. 5331 (Jan. 20, 1989).

16.     As a result, in 1989, the VRPA was enacted "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials[,]" including written materials such as books and magazines. M.C.L. Ch. 445. The VRPA therefore provides, in relevant part, that:

> a person, or an employee or agent of the person, engaged in the business selling at retail, renting, or lending books or other written materials, sound recordings, or video recordings shall not disclose to any person, other than the customer, a record or information concerning the purchase lease, rental, or borrowing of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712.

17.     As such, and in comparison to its more limited federal analogue, the Michigan VRPA expressly regulates a broader set of businesses (those engaged in, among other things, "the business of selling at retail . . . written materials") and protects a wider array of consumer information (*i.e.*, any "record or information concerning the purchase, rental, or borrowing of those materials by a customer that

indicates the identity of the customer"). *Compare* 18 U.S.C. § 2710 *with* M.C.L. §
445.1712.

## II.    Consumers' Personal Information Has Real Value.

18.    In 2001, Federal Trade Commission ("FTC") Commissioner Orson
Swindle remarked that "the digital revolution . . . has given an enormous capacity
to the acts of collecting and transmitting and flowing of information, unlike
anything we've ever seen in our lifetimes . . . and individuals are concerned about
being defined by the existing data on themselves."[1]

19.    More than a decade later, Commissioner Swindle's comments ring
truer than ever, as consumer data feeds an information marketplace that supports a
$26 billion dollar per year online advertising industry in the United States.[2]

20.    The FTC has also recognized that consumer data possesses inherent
monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of
> information collected by businesses, or why their information may be
> commercially valuable. *Data is currency. The larger the data set, the*
> *greater potential for analysis—and profit*.[3]

---

[1]      *The Information Marketplace: Merging and Exchanging Consumer Data*,
Federal Trade Commission, 8, 11 (Mar. 13, 2001), *available at*
http://www.ftc.gov/sites/default/files/documents/public_events/information-
[2]      *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*,
WSJ.com (Feb. 28, 2011),
http://online.wsj.com/article/SB10001424052748703529004576160764037920274
.html.
[3]      Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*,

21.     In fact, an entire industry exists where companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

22.     The scope of data miners' knowledge of consumers' private information is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.     Recognizing the serious threat the data mining industry poses to consumers' privacy, the Co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent letters to nine major data brokerage companies seeking information on how those companies compile, store, and sell their massive collections of

---

Federal Trade Commission, 2 (Dec. 7, 2009), *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (emphasis added).

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/.

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, The New York Times (June 16, 2012), http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html.

consumer data.[6] In their letters, the Co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on almost every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

24.    Unfortunately, magazine publishers like Defendants commonly engage in these practices by participating in "database cooperatives," where publishers can engage in the *quid pro quo* swapping of access to their respective customer lists that, by its nature, involves the disclosure of customers' Personal Reading Information.

25.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[6]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Senator Ed Markey (July 24, 2012), *available at* http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information.

[7]    *See*, *e.g.*, Letter from Edward J. Markey and Joe Barton, Co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 2, 2012) (emphasis added).

**III.    Defendants Unlawfully Disclose their Subscribers' Personal Reading Information.**

26.     Defendants maintain a vast digital database comprised of their subscribers' Personal Reading Information.

27.     Without seeking permission to do so, Defendants disclose this information to data mining companies who then supplement it with additional sensitive personal information about each subscriber—such as their e-mail addresses, age, gender, and household income.

28.     This, in turn, allows Defendants to amass highly detailed customer lists—sorted by, among other things, their subscribers' specific reading habits (*i.e.*, the specific magazine they've purchased and subscribed to) and demographic details (including the sensitive information described above that Defendants have obtained from data miners)—which they can then sell and otherwise disclose at a higher premium to interested third parties.

29.     Unfortunately, Defendants actively conceal these invasive data disclosure practices from their subscribers. In fact, Defendants uniformly fail to obtain any form of consent from—or even provide effective notice to—their subscribers before disclosing their Personal Reading Information to third parties.

30.     By and through these actions, Defendants not only disregard their subscribers' privacy, they also violate the VRPA.

## FACTS RELATING TO ALICE RADEN

31.     Plaintiff Alice Raden is a citizen of the State of Michigan.

32.     Raden purchased a one-year subscription to *Martha Stewart Living* from Defendants starting in September 2013.

33.     *Martha Stewart Living* is a magazine published, owned, and operated by Defendants.

34.     Raden never agreed in writing or otherwise to allow Defendants to sell or disclose her Personal Reading Information to any unrelated third parties.

35.     Raden did not receive notice of such disclosures before Defendants disclosed her Personal Reading Information to unrelated third parties.

36.     Defendants disclosed Raden's Personal Reading Information (*i.e.*, information that identifies Raden as having purchased a subscription to *Martha Stewart Living*)—without obtaining her permission or providing prior notice—to data mining companies, who appended the information with data from their own records.

37.     During this same time period, Defendants also disclosed Raden's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining her consent or giving her prior notice of the disclosures.

38.     These disclosures to unrelated third party companies squarely violated

the VRPA.

39.     Further, and even though it lacked permission to even disclose her Personal Reading Information in the first place, Defendants profited from their disclosures of Raden's Personal Reading Information.

40.     Ultimately, what Raden received (a subscription without privacy protections) was substantially less valuable than what she paid for (a subscription with accompanying privacy protections). Had she known that Defendants would disclose her Personal Reading Information to third parties without her permission, Raden would not have purchased her subscription. Thus, Raden has suffered concrete economic harm in the form of the monies paid to Defendants in exchange for the magazine subscription.

## FACTS RELATING TO BOBBIE MOORE

41.     Plaintiff Bobbie Moore is a citizen of the State of Michigan.

42.     Moore purchased her most recent subscription to *Martha Stewart Living* from Defendants starting in May 2015.

43.     *Martha Stewart Living* is a magazine published, owned, and operated by Defendants.

44.     Moore never agreed in writing or otherwise to allow Defendants to sell or disclose her Personal Reading Information to any unrelated third parties.

45.     Moore did not receive notice of such disclosures before Defendants

disclosed her Personal Reading Information to unrelated third parties.

46.     Defendants disclosed Moore's Personal Reading Information (*i.e.*, information that identifies Moore as having purchased a subscription to *Martha Stewart Living*)—without obtaining her permission or providing prior notice—to data mining companies, who appended the information with data from their own records.

47.     During this same time period, Defendants also disclosed Moore's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining her consent or giving her prior notice of the disclosures.

48.     These disclosures to unrelated third party companies squarely violated the VRPA.

49.     Further, and even though it lacked permission to even disclose her Personal Reading Information in the first place, Defendants profited from their disclosures of Moore's Personal Reading Information.

50.     Ultimately, what Moore received (a subscription without privacy protections) was substantially less valuable than what she paid for (a subscription with accompanying privacy protections). Had she known that Defendants would disclose her Personal Reading Information to third parties without her permission, Moore would not have purchased her subscription. Thus, Moore has suffered

concrete economic harm in the form of the monies paid to Defendants in exchange for the magazine subscription.

## CLASS ACTION ALLEGATIONS

51.    **Class Definition**: Plaintiffs bring this action on behalf of themselves and a proposed Class, defined as follows:

> All Michigan residents who purchased a subscription to *Martha Stewart Living* magazine.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

52.    **Numerosity**: The exact number of Class members is unknown to Plaintiffs at this time, but it is clear that individual joinder of each Class member is impracticable. Defendants have disclosed the Personal Reading Information of thousands of consumers who fall into the definition of the Class. Ultimately, members of the Class will be easily identified through Defendants' records.

53.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)    Whether Defendants are "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)    Whether Defendants obtained written permission before disclosing Plaintiffs' and the Class's Personal Reading Information to third parties;

(c)    Whether Defendants' disclosure of Plaintiffs' and the Class's Personal Reading Information violated the VRPA; and

(d)    Whether Defendants were unjustly enriched through their conduct described herein.

54.    **Typicality**: Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosure of Plaintiffs' and the Class's Personal Reading Information.

55.    **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class members, and have the financial

resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other Class members.

56. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect the Class members uniformly, and Plaintiffs' challenge of those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

57. **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendants' misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the

16

complex legal and factual controversies presented in this Complaint. By contrast, a

class action presents far fewer management difficulties and provides the benefits of

single adjudication, economy of scale, and comprehensive supervision by a single

court. Economies of time, effort, and expense will be fostered and uniformity of

decisions will be ensured.

58.     Plaintiffs reserve the right to revise the definition of the Class as

necessary based upon information learned in discovery.

## FIRST CAUSE OF ACTION
### Violation of M.C.L. § 445.1712
### (On Behalf of Plaintiffs and the Class)

59.     Plaintiffs incorporate the foregoing allegations as if fully set forth

herein.

60.     As a magazine publisher that sells subscriptions directly to consumers,

Defendants are engaged in the business of selling written materials at retail. *See*

M.C.L. § 445.1712.

61.     By purchasing a subscription to *Martha Stewart Living* from

Defendants, Plaintiffs purchased written materials at retail from Defendants. *See*

M.C.L. § 445.1712.

62.     Because Plaintiffs purchased written materials at retail from

Defendants, they are "customers" within the meaning of the VRPA. *See*

M.C.L. § 445.1711(a).

63.     Beginning when Plaintiffs first subscribed to *Martha Stewart Living*, Defendants disclosed their Personal Reading Information, which identified them as *Martha Stewart Living* subscribers, in at least two ways.

64.     First, Defendants disclosed customer lists containing Plaintiffs' Personal Reading Information to data mining companies who then supplemented the lists with additional sensitive information from their own databases.

65.     Second, Defendants disclosed customer lists containing Plaintiffs' Personal Reading Information to other third party companies that, in turn, sold and/or disclosed those lists (or access to those lists) to a number of other parties—including other magazine publishers.

66.     By disclosing their customer lists, Defendants disclosed to persons other than Plaintiffs, records or information concerning their purchases of written materials from Defendants. *See* M.C.L. § 445.1712.

67.     The information disclosed by Defendants communicates Plaintiffs' names and addresses, as well as the fact that they subscribed to *Martha Stewart Living.* Accordingly, the records or information disclosed by Defendants indicates Plaintiffs' identities. *See* M.C.L. § 445.1712.

68.     Plaintiffs never provided Defendants with consent to disclose their Personal Reading Information to anyone—in writing or otherwise.

69.     Worse still, Plaintiffs did not receive any prior notice of Defendants'

disclosures of their Personal Reading Information to third parties.

70.     On information and belief, Defendants' disclosures of Plaintiffs' Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

71.     Defendants' disclosures of Plaintiffs' Personal Reading Information were not made to collect payment for their subscriptions.

72.     Defendants' disclosures of Plaintiffs' Personal Reading information were made to third parties, including data miners and database cooperatives, in order to increase Defendants' revenue and ability to prospectively market their own products—*i.e.*, subscriptions to *Martha Stewart Living*—to the subscribers of *other* publications (among other reasons). Accordingly, Defendants' disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs.

73.     By disclosing Plaintiffs' Personal Reading Information, Defendants violated Plaintiffs' common law rights to privacy.

74.     By disclosing Plaintiffs' Personal Reading Information, Defendants violated Plaintiffs' statutorily protected rights to privacy in their reading habits. *See* M.C.L. § 445.1712.

75.     Further, because Plaintiffs paid money to Defendants for their *Martha Stewart Living* subscriptions, and Defendants were obligated to comply with the

VRPA, Defendants' unlawful disclosure of Plaintiffs' Personal Reading Information deprived them of the full value of their paid-for subscriptions. As such, and also because Plaintiffs ascribe monetary value to the privacy of their Personal Reading Information, Defendants' unlawful disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

76.     Likewise, because Plaintiffs and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private pursuant to the VRPA is more valuable than one that does not.

77.     Accordingly, had Plaintiffs known of Defendants' surreptitious disclosure practices at or before the time of their purchase, they would not have purchased their *Martha Stewart Living* magazine subscriptions. Thus, Defendants' unlawful disclosures caused Plaintiffs economic harm in the form of the purchase price of the magazine subscriptions.

78.     As described herein, Defendants generate substantial revenue by disclosing Plaintiffs' and the Class's Personal Reading Information to data miners and other unrelated third parties.

79.     As a result of Defendants' unlawful and continued disclosure of their Personal Reading Information, Plaintiffs and the other Class members have

suffered privacy and economic injuries. Accordingly, on behalf of themselves and the Class, Plaintiffs seek: (1) an injunction prohibiting Defendants from disclosing their and the Class's Personal Reading Information without first obtaining their written permission (*i.e.*, as required by the VRPA); (2) actual damages or $5,000.00, whichever is greater, per Class member pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

80.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

81.     Plaintiffs and the Class members conferred a benefit on Defendants by providing Defendants with their Personal Reading Information and paying Defendants for their magazine subscriptions. Defendants received and retained the information and money belonging to Plaintiffs and the Class when they purchased their subscriptions to Defendants' publication.

82.     Because Defendants received and processed Plaintiffs' and the Class's subscription payments and Personal Reading Information, and because Defendants process and fulfill the subscriptions and discloses Plaintiffs' and the Class's Personal Reading Information to third parties, Defendants appreciate and/or have

knowledge of such benefits.

83.    Under the VRPA, Plaintiffs and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

84.    Under principles of equity and good conscience, Defendants should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their subscriptions, or the money they received by disclosing Plaintiffs' and the Class's Personal Reading Information because Defendants failed to comply with the VRPA.

85.    Plaintiffs and the other Class members have suffered actual damages as a result of Defendants' unlawful conduct in the form of the monies paid for their magazine subscriptions, which they wouldn't have purchased had they known of Defendants' unlawful disclosure practices.

86.    To prevent inequity, Defendants should return to Plaintiffs and the Class all monies that they paid for their magazine subscriptions, and disgorge any profits derived from the disclosures at issue.

87.    Accordingly, on behalf of themselves and the Class, Plaintiffs seek an order declaring that Defendants' conduct constitutes unjust enrichment, and awarding them and the Class restitution in an amount equal to that which they paid to Defendants for their magazine subscriptions, as well as disgorgement of all profits derived by Defendants as a result of their unlawful disclosures of Plaintiffs'

and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Raden and Moore, on behalf of themselves and the Class, pray that the Court enter judgment in their favor and against Defendants, and for the following relief:

(1)     Certify the Class as defined above, appoint Plaintiffs as Class Representatives, and designate their counsel as Class Counsel;

(2)     Declare that Defendants' conduct as described herein violates the VRPA;

(3)     Declare that Defendants' conduct as described herein constitutes unjust enrichment;

(4)     Award actual damages, including disgorgement, or $5,000.00, whichever is greater, to each Class member, as provided by the VRPA;

(5)     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to cease the unlawful disclosures discussed herein;

(6)     Award reasonable attorneys' fees and costs pursuant to M.C.L. § 445.1715(b); and

(7)     Such other and further relief as the Court deems equitable and just.

## DEMAND FOR TRIAL BY JURY

Plaintiffs request trial by jury of all claims that can be so tried.

Respectfully submitted,

**ALICIA RADEN** and **BOBBIE MOORE**, individually and on behalf of all others similarly situated,

Dated: July 31, 2016

By: /s/ Ari J. Scharg
    One of Plaintiffs' Attorneys

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg (P28804)
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

*Counsel for Plaintiffs and the Putative Class*