## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALICE RADEN and BOBBIE MOORE, individually and on behalf of the settlement classes,<br><br>　　　　　Plaintiffs,<br><br>　v.<br><br>MARTHA STEWART LIVING OMNIMEDIA, INC., a Delaware corporation, and MEREDITH CORPORATION, an Iowa corporation.<br><br>　　　　　Defendants. | Case No.: 4:16-cv-12808<br><br>Hon. Linda V. Parker |

## PLAINTIFFS' MOTION FOR AND BRIEF IN SUPPORT OF
## ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS

**Respectfully submitted by:**

Ari J. Scharg
ascharg@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596-1111
Fax: (248) 671-0335

*Counsel for Plaintiffs and the
Settlement Classes*

**PLAINTIFFS' MOTION FOR**
**ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS**

Plaintiffs Alice Raden and Bobbie Moore hereby move the Court to grant their Motion for Attorneys' Fees, Expenses, and Incentive Awards. Specifically, Class Counsel respectfully requests that the Court grant $337,750—or 35% of the $965,000 non-reversionary Settlement Fund—in attorneys' fees and expenses and incentive awards of $5,000 each for Plaintiffs Alice Raden and Bobbie Moore for serving as Class Representatives. In accordance with Local Rule 7.1(a), Plaintiffs conferred with counsel for Defendants Martha Stewart Living Omnimedia, Inc. and Meredith Corporation on May 31, 2019. Defendants will not oppose the relief sought by this Motion.

For the reasons discussed in the accompanying brief, the Motion should be granted.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
<u>ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS</u>**

**STATEMENT OF ISSUES PRESENTED**

1.      Whether this Court should award Class Counsel attorneys' fees and expenses in the amount of $337,750—35% of the $965,000 non-reversionary common fund created for the benefit of the Direct Purchaser Settlement Class—to compensate them for achieving a substantial benefit for two classes of consumers under Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-1715, *et seq.*?

**Plaintiffs' Answer: Yes.**

2.      Whether this Court should award Plaintiffs Alice Raden and Bobbie Moore incentive awards of $5,000 each in recognition of their zealous efforts on behalf of the classes, which demanded active involvement in this case for over two years?

**Plaintiffs' Answer: Yes.**

## CONTROLLING AND MOST IMPORTANT AUTHORITY

**UNITED STATES SUPREME COURT CASES:**

*Boeing Co. v. Van Gemert*,
        444 U.S. 472 (1980)

*Eisen v. Carlisle & Jacquelin*,
        417 U.S. 156 (1974)

**UNITED STATES COURT OF APPEALS CASES:**

*Gascho v. Glob. Fitness Holdings, LLC*,
        No. 14-3761, 2016 WL 2802473 (6th Cir. May 13, 2016)

*Hadix v. Johnson*,
        322 F.3d 895 (6th Cir. 2003)

*In re Pampers Dry Max Litig.*,
        724 F.3d 713 (6th Cir. 2013)

*Isabel v. City of Memphis*,
        404 F.3d 404 (6th Cir. 2005)

*Ramey v. Cincinnati Enquirer, Inc.*,
        508 F.2d 1188 (6th Cir. 1974)

*Rawlings v. Prudential-Bache Props., Inc.*,
        9 F.3d 513 (6th Cir. 1993)

*Van Horn v. Nationwide Prop. & Cas. Ins. Co.*,
        436 F. App'x 496 (6th Cir. 2011)

**UNITED STATES DISTRICT COURT CASES:**

*Coulter-Owens v. Rodale, Inc.*,
        No. 14-cv-12688 (E.D. Mich. Sep. 29, 2016)

*Halaburda v. Bauer Publ'g Co., LP*,
        No. 12-cv-12831 (E.D. Mich. 2013)

ii

*Higgins v. TV Guide Magazine, LLC*,
    No. 2:15-cv-13769 (E.D. Mich. Dec. 19, 2018)

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 2003)

*In re Delphi Corp. Sec., Derivative & ERISA Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008)

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
    1996 WL 780512 (E.D. Mich. Dec. 20, 1996)

*Kinder v. Meredith Corp.*,
    No. 13-cv-11284 (E.D. Mich. May 18, 2016)

*Kogan v. AIMCO Fox, L.P.*,
    193 F.R.D. 496 (E.D. Mich. 2000)

*Moeller v. Am. Media, Inc.*,
    No. 5:16-cv-11367 (E.D. Mich. June 8, 2017)

*Perlin v. Time Inc.*,
    No. 16-cv-10635, (E.D. Mich. Oct. 15, 2018)

**MISCELLANEOUS:**

Fed. R. Civ. P. 23

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................... 1

II.    FACTUAL BACKGROUND AND UNDERLYING LAW ................... 3

       A.    Plaintiffs' Allegations Under the PPPA ......................... 3

       B.    The Litigation and Work Performed to Benefit the Classes ........ 6

       C.    The Terms of the Settlement Agreement ...................... 9

III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE
       AND SHOULD BE APPROVED ........................................ 10

       A.    The Percentage Method Should Be Used to Calculate Fees ........ 12

       B.    The Reasonableness of the Requested Fees Is Supported by
             This Circuit's Six-Factor Test .................................. 13

             1.    Class Counsel have secured a valuable benefit
                   for the class ............................................... 15

             2.    Society has a stake in incentivizing the pursuit of
                   complex consumer privacy litigation ...................... 20

             3.    Class Counsel took the case on a contingent basis,
                   confronting a significant risk of nonpayment ............. 22

             4.    The complexity of the litigation supports the
                   requested fees ............................................ 23

             5.    The parties are both represented by skilled counsel ......... 25

             6.    The value of the legal services performed on an hourly
                   basis is reasonable ....................................... 26

       C.    The Requested Incentive Award Reflects Plaintiffs' Active
             Involvement in This Action and Should Be Approved ........... 29

  IV.  CONCLUSION ............................................................ 32

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ................................................................... 14

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................... 21

*Frank v. Gaos*,
    139 S. Ct. 1041 (2019) ............................................................... 17

*Hensley v. Eckerhart*,
    461 U.S. 424 (1983) ................................................................... 27

*Perdue v. Kenny A. ex rel. Winn*,
    559 U.S. 542 (2010) ................................................................... 13

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ................................................. 6, 7, 24, 25

## United States Appellate Court Cases

*Bowling v. Pfizer, Inc.*,
    102 F.3d 777 (6th Cir. 1996) ..................................................... 14

*Brian A. v. Hattaway*,
    83 F. App'x 692 (6th Cir. 2003) ................................................ 27

*Coulter-Owens v. Time Inc.*,
    695 F. App'x 117 (6th Cir. 2017). ....................................... 6, 7, 26

*Deacon v. Pandora Media, Inc.*,
    655 F. App'x 581 (9th Cir. 2016) .............................................. 26

*Gascho v. Global Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ............................................ *passim*

*Geier v. Sundquist,*
    372 F.3d 784 (6th Cir. 2004) ....................................................................... 28

*Hadix v. Johnson*,
    322 F.3d 895 (6th Cir. 2003) ............................................................... 29, 30

*In re Pampers Dry Max Litig.,*
    724 F.3d 713 (6th Cir. 2013) ....................................................................... 30

*In re Sulzer Orthopedics, Inc.,*
    398 F.3d 778 (6th Cir. 2005) ....................................................................... 11

*Isabel v. City of Memphis,*
    404 F.3d 404 (6th Cir. 2005) ....................................................................... 26

*Johnson v. Georgia Highway Express, Inc.,*
    488 F.2d 714 (5th Cir. 1974) ....................................................................... 28

*Lane v. Facebook, Inc.,*
    696 F.3d 811 (9th Cir. 2012) ....................................................................... 17

*Ramey v. Cincinnati Enquirer, Inc.,*
    508 F.2d 1188 (6th Cir. 1974) ..................................................................... 14

*Rawlings v. Prudential-Bache Props., Inc.,*
    9 F.3d 513 (6th Cir. 1993) ........................................................................... 11

*Shane Grp., Inc. v. Blue Cross Blue Shield of Mich.,*
    825 F.3d 299 (6th Cir. 2016) ....................................................................... 31

*Van Horn v. Nationwide Property & Cas. Ins. Co.,*
    436 F. App'x 496 (6th Cir. 2011) ......................................................... 27, 28

**United States District Court Cases**

*Appoloni v. United States,*
    218 F.R.D. 556 (W.D. Mich. 2003) ............................................................ 21

*Barnes v. Aryzta,*
    No. 1:17-cv-07358 (N.D. Ill. Jan. 22, 2019) .............................................. 27

*Connectivity Sys. Inc. v. Nat'l City Bank*,
   2011 WL 292008 (S.D. Ohio Jan. 26, 2011)................................................. 28

*Coulter-Owens v. Rodale, Inc.*,
   1:14-cv-12688-RHC-RSW (E.D. Mich. Sep. 29, 2016)....................2, 13, 21

*Dick v. Sprint Commc'ns Co. L.P.*,
   297 F.R.D. 283 (W.D. Ky. 2014) ................................................................. 15

*Doe 1-2 v. Deja Vu Servs., Inc.*,
   2017 WL 2629101 (E.D. Mich. June 19, 2017)........................................... 18

*Fournier v. PFS Invs., Inc.*,
   997 F. Supp. 828 (E.D. Mich. 1998)............................................................ 12

*Gross v. Symantec Corp.*,
   No. 12-cv-00154 (N.D. Cal. March 21, 2014) ............................................. 27

*Halaburda v. Bauer Publ'g Co, LP*,
   2:12-cv-12831 (E.D. Mich.) ................................................................ *passim*

*Harris v. comScore*,
   No. 11-cv-05807 (N.D. Ill. 2014) ................................................................ 25

*Higgins v. TV Guide Magazine, LLC*,
   No. 2:15-cv-13769 (E.D. Mich. Dec. 19, 2018)................................. *passim*

*Hillson v. Kelly Servs. Inc.*,
   2017 WL 3446596 (E.D. Mich. Aug. 11, 2017) .......................................... 12

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) ...................................................... *passim*

*In re Cincinnati Gas & Elec. Co. Sec. Litig.*,
   643 F. Supp. 148 (S.D. Ohio 1986) ............................................................. 14

*In re CMS Energy ERISA Litig.*,
   2006 WL 2109499 (E.D. Mich. June 27, 2006) ........................................... 30

*In re Delphi Corp. Securities, Derivative & ERISA Litig.*,
  248 F.R.D. 483 (E.D. Mich. 2008) ...................................................11, 15, 24

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
  130 F.R.D. 366 (S.D. Ohio 1990)............................................................. 18

*In re Facebook Privacy Litig.*,
  No. 10-cv-02389 (N.D. Cal. 2010) ........................................................... 25

*In re Google Buzz Privacy Litig.*,
  2011 WL 7460099 (N.D. Cal. June 2, 2011) ............................................. 17

*In re Netflix Privacy Litig.*,
  No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011)............................................. 25

*In re Netflix Privacy Litig.*,
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ........................................... 17

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
  1996 WL 780512 (E.D. Mich. Dec. 20, 1996).........................14, 20, 22, 25

*In re S. Ohio Corr. Facility*,
  173 F.R.D. 205 (S.D. Ohio 1997)............................................................. 14

*In re Se. Milk Antitrust Litig.*,
  2013 WL 2155387 (E.D. Tenn. May 17, 2013) ......................................... 18

*Kelly v. Corrigan*,
  890 F. Supp. 2d 778 (E.D. Mich. 2012).................................................... 13

*Kinder v. Meredith Corp.*,
  1:13-cv-11284 (E.D. Mich. 2016) ..................................................... *passim*

*Kogan v. AIMCO Fox Chase L.P.*,
  193 F.R.D. 496 (E.D. Mich. 2000) ..................................................... 22, 27

*Kulesa v. PC Cleaner*,
  No. 12-cv-0725 (C.D. Cal. Aug. 26, 2014)............................................... 27

*Lasalle Town Houses Coop Assoc. v. City of Detroit*,
    2016 WL 1223354 (E.D. Mich. Mar. 29, 2016)..........................................29

*Manners v. Am. Gen. Life Ins. Co.*,
    1999 WL 33581944 (M.D. Tenn. Aug. 11, 1999)......................................28

*Merkner v. AK Steel Corp.*,
    2011 WL 13202629 (S.D. Ohio Jan. 10, 2011)..........................................29

*Moeller v. Am. Media, Inc.*,
    No. 5:16-cv-11367-JEL-EAS (E.D. Mich. June 8, 2017)..................... *passim*

*N.Y.S. Teachers' Ret. Sys. v. Gen. Motors Co.*,
    315 F.R.D. 226 (E.D. Mich. 2016) ............................................................12

*Perlin v. Time Inc.*,
    1:16-cv-10635 (E.D. Mich. Oct. 15, 2018) ......................................... *passim*

*Simpson v. Citizens Bank*,
    2014 WL 12738263 (E.D. Mich. Jan. 31, 2014) .........................................14

*Stanley v. U.S. Steel Co.*,
    2009 WL 4646647 (E.D. Mich. Dec. 8, 2009)....................................11, 22

*Wise v. Popoff*,
    835 F. Supp. 977 (E.D. Mich. 1993)...........................................................12

**State Court Cases**

*Beaumont v. Brown*,
    257 N.W.2d 522 (Mich. 1977) .....................................................................3

*Bradley v. Saranac Cnty. Sch. Bd. of Educ.,*,
    565 N.W.2d 650 (Mich. 1997) .....................................................................3

*Hawley v. Prof'l Credit Bureau, Inc.*,
    76 N.W.2d 835 (Mich. 1956) ......................................................................4

**Rules and Statutory Provisions**

Fed. R. Civ. Proc. 23 ........................................................................... 3, 11

M.C.L. § 445.1711-15 ............................................................................. 1

S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018) ........................................ 20

**Other Authorities**

*Privacy: Sales, Rentals of Videos, etc.*,
     House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989 ................... 4

## I.    INTRODUCTION

The Class Action Settlement Agreement between Plaintiffs Alice Raden and

Bobbie Moore ("Plaintiffs") and Defendants Martha Stewart Living Omnimedia,

Inc. ("MSLO") and Meredith Corporation ("Meredith") (together, "Defendants") is

the result of Class Counsel's vigorous prosecution of Defendants over the past two

years for claims arising out of their alleged violations of the Michigan Preservation

of Personal Privacy Act, M.C.L. § 445.1711-15 ("PPPA"), and unjust enrichment.[1]

Preliminary approval having been granted, Plaintiffs now respectfully request that

the Court approve their request for attorneys' fees, expenses, and incentive awards.

Class Counsel's efforts in pursuing and litigating this case has resulted in a

multi-part settlement providing meaningful relief to the classes. Under the

proposed Settlement—which was preliminarily approved on April 12, 2019—

Defendants have agreed to create a $965,000 non-reversionary common fund from

which Direct Purchaser Settlement Class Members who make valid claims will

receive a *pro rata* cash payment. Notably, the recovery per class member, which is

estimated to be approximately $60, is in line with the cash payments recovered in

other PPPA settlements that have received final approval by courts in this

---

[1]      A copy of the parties' Class Action Settlement Agreement ("Settlement" or
"Agreement") is attached hereto as Exhibit 1. Except as otherwise indicated, all
defined terms used herein shall have the same meanings ascribed to them in the
Agreement.

district—an exceptional result considering that Plaintiffs' PPPA claims (which carried statutory penalties) were dismissed at the pleadings stage. *See, e.g.*, *Coulter-Owens v. Rodale, Inc.*, No. 14-cv-12688, dkt. 54 (E.D. Mich. Sep. 29, 2016) (securing a $4.5 million fund for a class of approximately 580,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $44); *Perlin v. Time Inc.*, No. 16-cv-10635, dkt. 55 (E.D. Mich. Oct. 15, 2018) (securing a $7.4 million fund for a class of approximately 600,000 subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $50). Not only does the monetary relief provided stand up to that provided in other PPPA settlements, it dwarfs the recovery typically obtained in privacy class action settlements which often provide no direct monetary relief at all. Equally important, the Settlement puts an end to Defendants' alleged practice of disclosing the personal reading habits of the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class (the "Settlement Classes") to third parties and requires Defendants to perform annual audits to ensure their compliance with the Settlement.

Obtaining this valuable relief did not come easily. Rather, Class Counsel engaged in years of hard-fought litigation, which included investigation into MSLO's and Meredith's disclosure practices, complicated motion practice on dispositive issues, and significant informal discovery. Even then, numerous rounds

of arm's-length settlement negotiations were required before finally reaching the Settlement that forms the basis for the requested fees and expenses.

In light of Class Counsel's efforts and the exceptional result achieved, Plaintiffs respectfully request pursuant to Federal Rule of Civil Procedure 23(h) that the Court approve attorneys' fees and expenses of 35% of the Settlement Fund, or $337,750, as well as incentive awards of $5,000 each for Plaintiff Raden and Plaintiff Moore for their service as Class Representatives. As set forth below, the requested fee and incentive awards are at or below what has been awarded in other PPPA settlements in this district, fairly compensate Plaintiffs and Class Counsel for the time and effort expended in the case, and reflect the results achieved for the Settlement Classes and the substantial risks that they faced throughout the pendency of the litigation. The Court should therefore approve the requested attorneys' fees, expenses, and incentive awards.

## II.  FACTUAL BACKGROUND AND UNDERLYING LAW

A brief summary of the PPPA, the work performed by Class Counsel for the Settlement Classes' benefit, and the beneficial terms of the Settlement provide necessary context to the reasonableness of the requested fees and incentive awards.

### A.  Plaintiffs' Allegations Under the PPPA.

Michigan was "one of the first jurisdictions to acknowledge the concept of [a] 'right of privacy.'" *Beaumont v. Brown*, 257 N.W.2d 522, 526 (Mich. 1977),

*overruled on other grounds by Bradley v. Saranac Cmty. Sch. Bd. of Educ.*, 565

N.W.2d 650 (Mich. 1997). This right protects against the "unreasonable and

serious interference with [a citizen's] interest in not having his affairs known to

others." *Hawley v. Prof'l Credit Bureau, Inc.*, 76 N.W.2d 835, 841 (Mich. 1956)

(Smith, J. dissenting). The PPPA follows this tradition and prohibits retailers,

publishers, and other entities engaged in the business of selling written materials at

retail from disclosing records or information concerning the purchase of those

materials by a customer that indicates the identity of the customer without consent.

M.C.L. § 445.1712. The Michigan Legislature rightfully recognized that a person's

choice in reading materials "is nobody's business but one's own," and passed the

PPPA "to explicitly protect a consumer's privacy in buying and borrowing" such

materials. *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis

Section, H.B. 5331, Jan. 20, 1989. Given the importance of reader privacy, the

PPPA, in its original form, authorized civil actions to enforce the statute, and

provided for the recovery of statutory damages in the amount of $5,000, plus costs

and reasonable attorney fees. *See* M.C.L. § 445.1715. A 2016 amendment to the

law, however, removed the statutory-damages provision. *Id.*

Defendants MSLO and Meredith publish the popular magazine titles *Martha*

*Stewart Living* and *Martha Stewart Weddings*. (*See* Plaintiffs' Class Action

Complaint, dkt. 1 ["Compl."] ¶ 1.) Plaintiffs allege that in addition to their

consumer-facing magazine subscription business, Defendants operate a division

dedicated to selling information related to their customers' magazine subscription

histories and personal reading habits. (*Id.* ¶¶ 2, 24, 26–28, 63–65, 72.) But they

don't just sell lists of names that subscribe to *Martha Stewart Living* and *Martha*

*Stewart Weddings*. Rather, to increase the value of such information, Plaintiffs

allege that Defendants trade their customers' protected reading information with

certain data miners and other third parties in exchange for other demographic and

lifestyle data that such companies have already gathered (or "mined") on each

subscriber. (*Id.* ¶¶ 2, 21, 24, 28, 36–37, 46–47.) Defendants allegedly thereafter

"enhance" their own customer profiles with this additional data (e.g., their income

levels, religion, ages, race, political affiliations, travel habits, medical conditions,

etc.), and then sell the enhanced information to other unrelated third parties for

profit. (*Id.* ¶¶ 2, 21, 28, 39, 72.)

Plaintiffs further allege that no matter how they subscribe, whether via

postcard or online, customers never provide consent to disclose information to

third parties related to their magazine subscriptions. (*Id.* ¶¶ 3, 29, 34–40, 44–50,

68, 69.) This is because, as Plaintiffs allege, Defendants' subscribers are never

presented with or required to consent to any terms informing them of Defendants'

disclosure practices. (*Id.*) Plaintiffs also allege that even after subscribing,

Defendants fail to notify customers that they will disclose any information to third

parties, let alone their protected reading information. (*Id.* ¶¶ 3, 29, 34–37, 44–47, 68.) Nonetheless, Plaintiffs allege that Defendants are in the business of disclosing all of their subscribers' protected reading information to various third parties, without first obtaining their consent in violation of the PPPA. (*Id.* ¶¶ 2, 3, 28.)

**B.    The Litigation and Work Performed to Benefit the Classes.**

Given Defendants' alleged conduct, Plaintiffs filed this case on July 31, 2016, alleging Defendants violated the PPPA and were unjustly enriched. (*See id.*) Plaintiffs brought the case on behalf of themselves and a putative class of "all Michigan residents who purchased a subscription to *Martha Stewart Living* magazine." (*Id.* ¶ 51.) At the time, pending in the Sixth Circuit was an appeal in *Coulter-Owens v. Time, Inc.*—a similar PPPA case—regarding when and from who an individual purchases a magazine "at retail" and thus is entitled to invoke the PPPA's protections. *See Coulter-Owens v. Time, Inc.*, No. 16-1321, *appeal docketed*, Mar. 17, 2016 (6th Cir.).

On September 29, 2016, Defendants moved to dismiss Plaintiffs' claims under Rules 12(b)(1) and (b)(6), arguing that Plaintiffs lacked Article III standing because they had suffered no cognizable injury, that Plaintiffs could not state a claim under the PPPA because the 2016 amendment requiring actual damages applied retroactively to their claims, and that Defendants were not unjustly enriched by their disclosure practices. (Dkt. 11.) Plaintiffs opposed the motion on

the grounds that the amended PPPA only applies prospectively to claims that, unlike Plaintiffs', accrued after its effective date, and that Defendants misunderstood *Spokeo v. Robbins*, 136 S. Ct. 1540 (2016), which actually confirmed that Plaintiffs have Article III standing because Defendants' undisputed disclosure of their personal reading choices was an invasion of their legally protected privacy interests. (Dkt. 12.)

While the motion was pending, the Sixth Circuit issued its decision in *Coulter-Owens*. The Court held that consumers generally have standing to sue over alleged disclosures of personal information in violation of the PPPA because such an act violates the consumer's substantive privacy rights created by the PPPA and because the actual-damages requirement in the amended PPPA did not apply retroactively. 695 F. App'x 117, 120-21 (6th Cir. 2017). In considering the statute's "at retail" limitation, however, the court held that the PPPA's private right of action applies only to sales made by defendants directly to customers, and not to sales made through third-party subscription agents. *Id.* at 122-24.

On July 20, 2017, this Court granted Defendants' motion to dismiss in part. Accepting Plaintiffs' view (which was adopted by the Sixth Circuit), the Court concluded that Plaintiffs have standing under *Spokeo* because they alleged an invasion of their substantive legal interests. (Dkt. 23 at 6-7.) The Court, however, dismissed Plaintiffs' PPPA claims under the newly amended statute, concluding

that the appropriate date to determine whether a statute applies retroactively is the date the lawsuit is filed, rather than the date the cause of action accrues. (*Id*. at 7-10.) Plaintiffs' claims for unjust enrichment, on the other hand, were allowed to move forward. (*Id.* at 10-11.) On August 3, 2017, Defendants separately answered the remaining allegations of the Complaint, each denying the claims and raising numerous affirmative defenses. (Dkts. 25, 26.)

On August 7, 2017, Plaintiffs moved the Court to partially reconsider its Order dismissing their PPPA claims. (Dkt. 27.) Plaintiffs asserted that their claims are not subject to the amended PPPA, and thus should not have been dismissed for failure to allege "actual damages", because their claims accrued before the statute was amended, and the accrual date—not the date the complaint was filed—controls. (*Id*.) After full briefing, the Court denied Plaintiffs' motion on January 18, 2018. (Dkt. 30.)

The parties then exchanged initial disclosures on February 8, 2018, and soon after, began engaging in settlement discussions and exchanging informal discovery related to, *inter alia*, the total size and composition of the two Settlement Classes. (Declaration of Ari J. Scharg in Support of Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards ["Scharg Decl."], attached hereto as Exhibit 2, ¶ 4.) While still discussing the possibility of early resolution, the parties filed a joint discovery plan on June 25, 2018, and the Court entered a Scheduling Order shortly

thereafter and referred the parties to a magistrate judge for a settlement conference to take place on February 11, 2019. (Dkts. 40 - 43.)

Over the following months, the parties continued their settlement discussions in an effort to resolve the case without the expense of further litigation, which would necessarily include adversarial class certification, summary judgment briefing, and appeals. (Scharg Decl. ¶ 5.) During these discussions, the parties explored what a settlement resolving the claims of both direct and indirect subscribers might look like, resulting in Defendants providing further informal discovery regarding the number of direct and indirect subscribers and from whom they purchased their subscriptions. (*Id.* ¶ 6.) With that information in hand, and after months of arm's-length negotiations between counsel experienced in valuing and negotiating PPPA class settlements, the parties ultimately reached an agreement on the principal terms of the Settlement. (*Id.*) The parties then diligently prepared and executed the written Settlement Agreement, which the Court preliminarily approved on April 12, 2019. (*Id.* ¶ 7; dkt. 48.)

## C.    The Terms of the Settlement Agreement.

Class Counsel's efforts in prosecuting this case against Defendants over the past two years has resulted in an excellent deal for the Settlement Classes, delivering cash relief to the Direct Purchaser Settlement Class (i.e., those class members who potentially have actionable PPPA claims under the Sixth Circuit's

decision in *Coulter-Owens*) and significant prospective relief to both Settlement Classes. (Scharg Decl. ¶¶ 8–9.) Specifically, the Settlement creates a non-reversionary $965,000 Settlement Fund (Agreement ¶¶ 1.31, 2.1(a)), from which claiming Direct Purchaser Settlement Class Members will receive a *pro rata* cash payment. (*Id.* ¶ 2.1(b).) The Settlement also achieves one of the primary purposes of the lawsuit: prohibiting Defendants from disclosing their Michigan customers' subscription information to any third-party companies, without first obtaining their express written consent, and requiring Defendants to complete annual audits to ensure compliance with the Settlement. (*Id.* ¶ 2.2(a), (d).) Both the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class will benefit from this prospective relief. (*Id.*)

On the basis of this relief, Plaintiffs move for an award of attorneys' fees of $337,750 and incentive awards of $5,000 each. As explained in detail below, the requested attorneys' fees and incentive awards are reasonable.

## III.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE AND SHOULD BE APPROVED.

The requested fee award of $337,750, representing 35% of the common fund, is reasonable and merits approval. Under Federal Rule of Civil Procedure 23(h), courts may award "reasonable attorney's fees and nontaxable costs that are

authorized by law or by the parties' agreement."[2] Fed. R. Civ. P. 23(h); *Stanley v. U.S. Steel Co.*, 2009 WL 4646647, at *1 (E.D. Mich. Dec. 8, 2009). Here, the preliminarily approved Class Action Settlement Agreement between the parties provides that Class Counsel may petition the Court for an award up to 35% of the Settlement Fund. (Agreement ¶ 8.1).

In common-fund cases such as this one, courts in the Sixth Circuit apply one of two fee calculation methods—percentage-of-the-fund or lodestar—and under either method, the fees "need only 'be reasonable under the circumstances.'" *In re Sulzer Orthopedics, Inc.*, 398 F.3d 778, 780 (6th Cir. 2005) (quoting *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516-17 (6th Cir. 1993)). While the Court has discretion in deciding whether to apply the percentage-of-the-fund calculation or the lodestar method, *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 280 (6th Cir. 2016), whichever method it ultimately selects must be justified by "a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at that fee," keeping the unique circumstances of each case in mind. *Id.* (quoting *Rawlings*, 9 F.3d at 516).

---

[2] The requested fee award also encompasses unreimbursed litigation expenses. (Agreement ¶ 8.1.) Reasonable litigation-related expenses are customarily awarded in common-fund cases and include costs such as document preparation and travel. *In re Delphi Corp. Secs., Derivative & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008). Thus, included in the requested fee award are $1,036.31 of out-of-pocket expenses in these standard categories. (*See* Scharg Decl. ¶ 17.)

11

**A.      The Percentage Method Should Be Used to Calculate Fees.**

Notwithstanding the Court's discretion in selecting a method for calculating

fees, courts generally prefer to use the percentage-of-the-fund method in common

fund cases such as this. *See, e.g.*, *In re Cardizem CD Antitrust Litig.*, 218 F.R.D.

508, 532 (E.D. Mich. 2003) ("This Court's decision to apply the percentage-of-the-

fund method is consistent with the majority trend."); *Fournier v. PFS Invs., Inc.*,

997 F. Supp. 828, 831-32 (E.D. Mich. 1998) ("[M]any courts have strayed from

using lodestar in common fund cases and moved towards the percentage of the

fund method which allows for a more accurate approximation of a reasonable

award for fees."); *Wise v. Popoff*, 835 F. Supp. 977, 980 (E.D. Mich. 1993) (same);

*Hillson v. Kelly Servs. Inc.*, 2017 WL 3446596, at *2 (E.D. Mich. Aug. 11, 2017)

(stating that "[t]he percentage-of-recovery approach is 'easy to calculate' and

'establishes reasonable expectations on the part of plaintiffs' attorneys[.]'").

This is so because while "[t]he lodestar method better accounts for the

amount of work done . . . the percentage of the fund method more accurately

reflects the results achieved." *N.Y.S. Teachers' Ret. Sys. v. Gen. Motors Co.*, 315

F.R.D. 226, 243 (E.D. Mich. 2016); *see also Fournier*, 997 F. Supp. at 831

(explaining that the lodestar method should be avoided in situations where a

common fund exists and the lodestar method will not "adequately acknowledge . . .

the result achieved"). Thus, the percentage-of-the-fund approach better

incentivizes attorneys to maximize recovery for absent class members. In fact, the percentage-of-the-fund method has been used to determine a reasonable fee award in the six other major PPPA class action settlements in this district. *Halaburda v. Bauer Publ'g Co., LP*, No. 12-cv-12831, dkt. 68 (E.D. Mich. 2015); *Kinder v. Meredith Corp.*, No. 13-cv-11284, dkt. 81 (E.D. Mich. 2016); *Rodale*, No. 14-cv-12688, dkt. 54; *Moeller v. Am. Media, Inc.*, No. 5:16-cv-11367, dkt. 42 (E.D. Mich. June 8, 2017); *Perlin*, No. 16-cv-10635, dkt. 55; *Higgins v. TV Guide Magazine, LLC*, No. 2:15-cv-13769, dkt. 81 (E.D. Mich. Dec. 19, 2018).

In contrast, the lodestar approach hasn't once been used to evaluate fees in these cases. That approach is most often applied in federal fee-shifting cases, particularly civil rights actions. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010); *Kelly v. Corrigan*, 890 F. Supp. 2d 778, 787 (E.D. Mich. 2012). For these reasons, the Court should not hesitate to use the percentage-of-the-fund method in this case.

**B.     The Reasonableness of the Requested Fees Is Supported by This Circuit's Six-Factor Test.**

The Sixth Circuit has articulated six factors that should be considered when determining the reasonableness of a requested percentage of a common fund to award as attorneys' fees: (1) the value of the benefit to the class; (2) society's stake in rewarding attorneys who produce the settlement's benefits, to maintain an incentive to others; (3) whether the work was performed on a contingent fee basis;

(4) the complexity of the litigation; (5) the skill and standing of counsel on both sides; and (6) the value of the legal services performed on an hourly basis. *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996); *In re Cardizem*, 218 F.R.D. at 533.

A "reasonable" fee in common-fund cases "typically rang[es] from 20 to 50 percent of the fund." *In re Rio Hair Naturalizer Prod. Liab. Litig.*, 1996 WL 780512, at *16 (E.D. Mich. Dec. 20, 1996); *In re S. Ohio Corr. Facility*, 173 F.R.D. 205, 217 (S.D. Ohio 1997) ("Typically, the percentage awarded ranges from 20 to 50 percent of the common fund created."); *Simpson v. Citizens Bank*, 2014 WL 12738263, at *6 (E.D. Mich. Jan. 31, 2014) ("[D]istrict courts in the Sixth Circuit begin with a 'benchmark percentage' ranging between 20-50%") (citing *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 150 (S.D. Ohio 1986)). In PPPA cases in particular, courts in this District have awarded up to 40% of the common fund in attorneys' fees, *Perlin*, No. 16-cv-10635, dkt. 55, and have regularly awarded the 35% requested here, *see Kinder*, No. 13-cv-11284, dkt. 81; *Moeller*, No. 5:16-cv-11367, dkt. 42; *Higgins*, No. 2:15-cv-13769, dkt. 81. The amount awarded is calculated as a percentage "from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *Gascho,* 822 F.3d at 282 (calculating the percentage, as "[a]ttorney's fees are the numerator" and "the dollar amount of the Total Benefit to the class (which includes the 'benefit to class

14

members,' the attorney's fees, and [potentially] the costs of administration)" is the denominator).

In this case, each of the relevant factors supports the requested fee award, and as such, the Court should find a fee award of 35% reasonable.

### 1.   Class Counsel have secured a valuable benefit for the Settlement Classes.

The value of the benefit to the class is the most important factor in assessing the reasonableness of fees. *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 299 (W.D. Ky. 2014); *In re Delphi*, 248 F.R.D. at 503 (describing the result achieved for the class as "[t]he primary factor"). Assessing the overall value includes consideration of both tangible and intangible benefits. *See Gascho*, 822 F.3d at 282 (requiring "appropriate consideration" of "cash and noncash settlement components" in assessing the total benefits to the class). The risk of continued litigation can also be considered in relation to the value of the benefit to the class under this factor. *Dick*, 297 F.R.D. at 299.

The instant Settlement is an excellent result for the Class, offering immediate cash payments to Direct Purchaser Settlement Class Members with no money reverting to Defendants, and providing significant prospective relief to all members of both Settlement Classes. (Agreement ¶¶ 1.33, 2.1–2.2.) Specifically, the Settlement creates a $965,000 Settlement Fund for the benefit of approximately 55,176 members of the Direct Purchaser Settlement Class who, based on

15

anticipated claims rates, should expect to recover approximately $60 per person.[3]
(Scharg Decl. ¶ 9.) This cash payment falls in line with the payments class
members have received in previous PPPA settlements in this District. *See, e.g.*,
*Rodale*, No. 14-cv-12688, dkt. 54 (securing a $4.5 million fund for a class of
approximately 580,000 subscribers under PPPA with claiming class members
receiving a *pro rata* payment of approximately $44); *Perlin*, No. 16-cv-10635, dkt.
55 (securing a $7.4 million fund for a class of approximately 600,000 subscribers
under PPPA with claiming class members receiving a *pro rata* payment of
approximately $50); *Kinder*, No. 13-cv-11284, dkt. 81 (securing a $7.5 million
fund for a class of approximately 980,000 subscribers under PPPA with claiming
class members receiving a *pro rata* payment of approximately $50); *Higgins*, No.
2:15-cv-13769, dkt. 81 (securing a $1.7 million fund for a class of approximately
90,000 subscribers under PPPA with claiming class members receiving a *pro rata*
payment of approximately $60); *Halaburda*, No. 12-cv-12831, dkt. 68 (securing a
$775,000 fund for a class of 40,000 subscribers under PPPA with claiming class

---

[3]      This estimation is based upon a participation rate of 15%, which is typical in
PPPA class action settlements and is on the high end of consumer class action
claims rates in general. *See Perlin*, No. 16-cv-10635, dkt. 55 (achieving claims rate
of over 14% in PPPA case); *Higgins*, No. 2:15-cv-13769, dkt. 81 (claims rate of
15% in PPPA case); *Gascho*, 822 F.3d at 290 (crediting expert testimony "that
response rates in class actions generally range from 1 to 12 percent, with a median
response rate of 5 to 8 percent.").

members receiving a *pro rata* payment of approximately $74); *Moeller*, No. 5:16-cv-11367, dkt. 42 (securing a $7.6 million fund for a class of 415,000 subscribers under PPPA with claiming class members receiving an estimated $100).

And when compared to the typical privacy class action settlement, the anticipated $60 *pro rata* payments are quite remarkable, where more often than not these cases have featured enormous classes and money only going to *cy pres* and not individual class members. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820-22 (9th Cir. 2012) (affirming $9.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in class of millions), *cert. denied* 134 U.S. 8 (Nov. 4, 2013); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2, 2011) (approving $8.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in a class of millions); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013) (approving $9 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of $2,500 per claim were available to class of millions); *see also Frank v. Gaos*, 139 S. Ct. 1041, 1047–48 (2019) (Thomas, J., dissenting) (criticizing *cy pres* settlement and stating that "*cy pres* payments are not a form of relief to the absent class members and should not be treated as such (including when calculating attorney's fees")).

17

And, although Class Counsel do not assign a monetary value to the prospective relief the Settlement affords, there is no doubt that this relief is valuable to the Settlement Classes as well—indeed it was the paramount goal of this lawsuit. *See, e.g.*, *Doe 1-2 v. Deja Vu Servs., Inc.*, 2017 WL 2629101, at \*11 (E.D. Mich. June 19, 2017) (considering changes to defendants' business practices in analyzing the benefit to the class); *In re Se. Milk Antitrust Litig.*, 2013 WL 2155387, at \*3 (E.D. Tenn. May 17, 2013) (considering structural changes to industry practices in assessing value of benefit); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373 (S.D. Ohio 1990) (considering non-monetary benefits requiring changes in defendant's operating procedures in assessing value of benefit). Here, the Settlement's prospective relief provides significant value to the Settlement Classes by (i) ensuring that, for a period of three years, Defendants will not disclose its Michigan customers' subscriber information to third parties without prior express written consent, and (2) requiring that Defendants perform annual audits to ensure compliance with the Settlement's prospective provisions. ((Agreement ¶¶ 2.2(a)-(d).) *See, e.g.*, *Halaburda*, dkt. 69 at 19 (E.D. Mich. Jan. 6, 2015) (finally approving a class action in similar PPPA litigation and finding that "the more important provisions of the settlement agreement are the provisions according equitable relief and a cessation of the disclosure altogether for this period of four years by the defendants").

18

In terms of PPPA class actions, specifically, the requested fee award of

35%—which does not account for the prospective benefits achieved for both

Settlement Classes—is consistent with percentage awards in previous cases in this

District. *See, e.g., Perlin*, No. 16-cv-10635, dkt. 55 (awarding 40% of $7.4 million

common fund); *Higgins*, No. 2:15-cv-13769, dkt. 81 (awarding 35% of $1.7

million common fund); *Moeller*, No. 5:16-cv-11367, dkt. 42 (awarding 35% of

$7.6 million common fund); *Kinder*, No. 13-cv-11284, dkt. 81 (awarding 35% of

$7.5 million common fund).

Moreover, in light of the litany of risks associated with continued litigation,

the Settlement is an outstanding result. Those risks—which are thoroughly

described in Plaintiffs' Motion for Preliminary Approval of Class Action

Settlement, (dkt. 46, at 31–36)—include: (i) prevailing on Plaintiffs' only

surviving claims for unjust enrichment, both individually and on a class basis; (ii)

or alternatively, successfully appealing Plaintiffs' dismissed PPPA claims; (iii)

persuading the Sixth Circuit to overrule its unpublished decision in *Coulter-Owens*,

in part, and find that indirect purchasers also purchased their subscriptions "at

retail" within the meaning of the statute; (iv) defeating Defendants' numerous

defenses against PPPA liability, including, for example, that Defendants only

disclosed magazine subscription information to their agents and did not sell the

magazine subscriptions "at retail"; (v) prevailing in the first ever trial of PPPA

claims; and (vi) defeating inevitable post-judgment motions over the size of any statutory damage award. What's more, all of those litigation risks were underscored by serious legislative risks: the possibility that the Michigan Legislature might pass a bill—introduced on May 8, 2018—that would repeal the statutory damages provision of the PPPA retroactively, meaning that even if Plaintiffs successfully revived their PPPA claims in the Sixth Circuit, the Act's $5,000 statutory damages would not be an available remedy. *See* S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018).

Weighed against the risks of continued litigation, the value of the immediate cash and prospective relief that the Settlement affords supports the reasonableness of the requested attorneys' fees. The first factor is well satisfied.

## 2. *Society has a stake in incentivizing the pursuit of complex consumer privacy litigation.*

Society has a strong stake in rewarding attorneys who produce the type of benefits achieved by the Settlement here. *See In re Cardizem*, 218 F.R.D. at 533; *see also Gascho*, 822 F.3d at 287 ("Consumer class actions . . . have value to society more broadly, both as deterrents to unlawful behavior . . . and as private law enforcement regimes that free public sector resources."). It is therefore in society's interest to encourage litigation that protects important consumer privacy rights that would not otherwise be safeguarded. *In re Rio*, 1996 WL 780512, at *17 ("Without compensation to those who are willing to undertake the inherent

20

complexities and unknowns of consumer class action litigation, enforcement of the federal and state consumer protection laws would be jeopardized[.]”); *In re Cardizem,* 218 F.R.D. at 534 (“Encouraging qualified counsel to bring inherently difficult and risky but beneficial class actions . . . benefits society.”). Further, when individual class members seek a relatively small amount of damages, “economic reality dictates that [their] suit proceed as a class action or not at all.” *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974); *Appoloni v. United States*, 218 F.R.D. 556, 563 (W.D. Mich. 2003), *amended*, 219 F.R.D. 116 (W.D. Mich. 2003).

Society undoubtedly has a strong interest in incentivizing lawyers to bring complex litigation that is necessary to protect the privacy of Michiganders’ personal reading choices. *See Rodale*, No. 14-cv-12688, dkt. 54 (finding that “[s]ociety has an interest in incentivizing the plaintiffs’ bar to investigate and litigate [PPPA] cases through the award of contingent fees”). In fact, class action litigation in this area is the most realistic means of safeguarding the privacy of readers under the PPPA, given the complexity and cost of this and similar litigation compared with the potential individual recovery. Thus, the realistic alternative to a class action in this case would have been no enforcement at all, permitting Defendants’ allegedly unlawful conduct to continue unabated. This second factor thus supports the requested fee award.

21

### 3. *Class Counsel took the case on a contingent basis, confronting a significant risk of nonpayment.*

The fact that Class Counsel litigated this case on a contingency fee basis lends additional support to the reasonableness of the requested fee award. *See In re Cardizem*, 218 F.R.D. at 533; *Stanley*, 2009 WL 4646647, at *3 ("Numerous cases recognize that the contingent fee risk is an important factor in determining the fee award."). When attorneys invest significant time and resources in pursuing the litigation, despite the risk they will not be compensated, courts generally find this factor weighs in favor of granting the requested fees. *In re Rio*, 1996 WL 780512, at *18; *Kogan v. AIMCO Fox Chase L.P.*, 193 F.R.D. 496, 504 (E.D. Mich. 2000). The contingent nature of the case is amplified where class counsel face a formidable defendant. *See In re Cardizem,* 218 F.R.D. at 533.

As reflected in both Plaintiff Raden's and Plaintiff Moore's retainer agreements, Class Counsel pursued this action purely on a contingency basis. (Scharg Decl. ¶ 10.) For over two years, Class Counsel has invested significant time, effort, and resources to the litigation without any compensation. (*Id.* ¶ 11.) Cognizant of the risk of nonpayment, Class Counsel nonetheless embarked on a fact-intensive investigation of MSLO's and Meredith's practices, engaged in robust Rule 12 motion practice, moved the Court to reconsider its partial dismissal Order, exchanged extensive informal discovery, and eventually, engaged in meaningful settlement discussions and numerous rounds of arm's-length

22

negotiations. (*Id.* ¶ 12.) At all times Class Counsel fronted this investment of time and resources, despite the significant risk of nonpayment inherent in this case. (*Id.* ¶ 13.) And given the defenses mounted by Defendants, the fairly limited history of PPPA litigation, and the numerous other litigation risks noted above, success on the legal issues presented was far from certain. (*Id.*)

In addition, Class Counsel faced highly qualified defense counsel, who themselves have represented leading magazine publishers in related PPPA litigation, and who have been successful in defeating other PPPA cases. Thus, the expertise and success of defense counsel in other PPPA cases only further underscores the risks Class Counsel faced in pursuing this litigation. (*Id.* ¶ 15.)

Given the contingent nature of the litigation and the significant risk of nonpayment, the third factor also supports the reasonableness of the requested fee award.

### 4.    *The complexity of the litigation supports the requested fees.*

The complexity of the litigation also reinforces the reasonableness of a requested fee award. *In re Cardizem*, 218 F.R.D. at 533. This case involved multiple layers of factual complexity, beginning with an extensive preliminary investigation into MSLO's and Meredith's business practices, their methods of data collection and aggregation, and the nature of their relationships with various third-party companies. (Scharg Decl. ¶ 12.)

The case involved complex legal issues as well. At the motion to dismiss stage, Defendants raised the novel issues of whether the Michigan Legislature's recently enacted amendment to the PPPA would apply retroactively to bar Plaintiffs' claims for statutory damages, and whether Plaintiffs, who allege no actual damage, have standing to assert their PPPA claims in light of the Supreme Court's then-recent decision on Article III standing in *Spokeo*. (*See* dkts. 11, 12, 14.) Each of these issues required Class Counsel to form novel arguments based on new and emerging legal authority. And while Plaintiffs and Class Counsel prevailed on the Article III standing issue—and hope that they would prevail on the retroactive application of the PPPA issue in the Sixth Circuit—Defendants have made clear that, but for the Settlement, they would continue to assert other complex and novel legal issues. (*See* Scharg Decl. ¶¶ 13, 15.)

In the end, because this case involved complex factual and legal questions under the PPPA, the complexity of the litigation further supports the reasonableness of the requested fees. *See In re Cardizem*, 218 F.R.D. at 534 (approving fee request where "[p]laintiffs' [c]ounsel, from the very beginning of this litigation, demonstrated a thorough understanding of the case, the industry, [d]efendants' business operations, and effectively and efficiently prosecuted and settled this matter").

### 5.    *The parties are both represented by skilled counsel.*

The skill and standing of counsel on both sides, including their experience and professionalism, also validates the reasonableness of a requested fee award. *In re Rio*, 1996 WL 780512, at *18. In cases where counsel for both parties have significant experience, courts have found that "the ability of [counsel] to negotiate a favorable settlement in the face of formidable legal opposition further evidences the reasonableness of the fee award requested." *In re Delphi*, 248 F.R.D. at 504.

Class Counsel are well-respected members of the legal community with significant experience litigating consumer class actions of similar size, scope, and complexity. (Scharg Decl. ¶ 14.) (*See also* Edelson PC Firm Resume, attached as Exhibit 2-A.) In addition to being at the forefront of PPPA litigation, *see*, *e.g.*, *Halaburda*, No. 12-cv-12831, dkt. 68, Edelson PC is widely known for its work in the area of consumer privacy litigation. *See, e.g.*, *Spokeo*, 136 S. Ct. 1540; *In re Facebook Privacy Litig.*, No. 10-cv-02389, dkt. 69 at 5 (N.D. Cal. 2010) (recognizing Edelson PC as "pioneers in the electronic privacy class action field"); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379, dkt. 59 (N.D. Cal. Aug. 12, 2011) (noting Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class actions"); *see also Harris v. comScore*, No. 11-cv-05807, dkt. 369 (N.D. Ill. 2014) (granting final approval to one of the largest consumer class actions ever brought under federal electronic privacy laws, in

which Edelson PC served as sole lead counsel).

As mentioned above, Class Counsel also faced formidable defense counsel in this action. Defendants were represented by two notable defense firms—Mandell Menkes LLC and ZwillGen PLLC. (Scharg Decl. ¶ 15.) ZwillGen has a strong track record defending class actions under the PPPA, having secured appellate victories in *Deacon v. Pandora Media, Inc.*, 655 F. App'x 581 (9th Cir. 2016), and *Coulter-Owens v. Time Inc.*, 695 F. App'x 117 (6th Cir. 2017). (Scharg Decl. ¶ 15.) Opposing counsel has at all times vigorously defended their clients throughout the litigation and has made clear that, but for the Settlement, they would continue to dispute each of their client's liability, assert multiple defenses, and even challenge the constitutionality of the PPPA itself through appeal. (*Id.*)

Given the skill and standing of counsel on both sides, the reasonableness of the requested fee award is apparent.

### 6. *The value of the legal services performed on an hourly basis is reasonable.*

The sixth and final factor assesses the value of the legal services performed on an hourly basis. *In re Cardizem*, 218 F.R.D. at 533. The value of the legal services performed essentially amounts to a lodestar, which involves multiplying the number of hours counsel reasonably expended on the matter by their reasonable hourly rate. *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir.

2005) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).[4] A good-faith effort

must be made to exclude hours that are excessive or otherwise unnecessary.

*Hensley,* 461 U.S. at 434; *Brian A. v. Hattaway*, 83 F. App'x 692, 695 (6th Cir.

2003).

To date, Class Counsel have expended 463.3 hours litigating this case.

(Scharg Decl. ¶ 16.) The value of Class Counsel's services at their current hourly

rates amounts to $230,197.50.[5] (*Id.* ¶ 17.) Therefore, the value of the time spent

litigating this case and securing the Settlement, including reimbursable expenses of

$1,036.31, totals $231,233.81. (*Id.*)[6]

---

[4]    Although this factor may be viewed as a lodestar cross-check, *see Kogan*,
193 F.R.D. at 504, a cross-check is entirely optional. *See Van Horn v. Nationwide
Property & Cas. Ins. Co.*, 436 F. App'x 496, 501 (6th Cir. 2011) (finding that
district courts have complete discretion when deciding to calculate attorneys' fees
based on the percentage-of-the-fund or lodestar methods, and thus a cross-check
analysis is optional).

[5]    Numerous courts have readily approved Class Counsel's rates in similar
consumer class action litigation. *See, e.g.*, *Barnes v. Aryzta*, No. 1:17-cv-07358,
dkt. 71 at 5–7 (N.D. Ill. Jan. 22, 2019) ("Counsel's rates are reasonable given the
market rate that hourly clients are willing to pay, judicial approval of their rates,
and their level of reputation and expertise in the area."); *Gross v. Symantec Corp.*,
No. 12-cv-00154, dkt. 88 (N.D. Cal. Mar. 21, 2014) (noting that Edelson PC's
current "hourly rates are reasonable and have previously been approved by other
courts throughout the country"); *Kulesa v. PC Cleaner*, No. 12-cv-0725, dkt. 101,
at 16–17 (C.D. Cal. Aug. 26, 2014) (explicitly finding Edelson PC's lodestar
reasonable and awarding enhanced lodestar).

[6]    This figure does not include the additional $20,000 to $40,000 in fees that
Class Counsel will likely incur in connection with proceeding through final

Further, the Court has discretion to increase the base value of Class Counsel's services based on certain factors, known as a "multiplier." *Van Horn*, at 499-500 (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). Salient factors include the results achieved, the risk of not prevailing in the action, the skill and experience of the attorneys, and awards in similar cases. *See Geier v. Sundquist*, 372 F.3d 784, 793 (6th Cir. 2004); *see also Van Horn*, 436 F. App'x at 500.[7] Typical multipliers in this Circuit range from two to five, *see Connectivity Sys. Inc. v. Nat'l City Bank*, 2011 WL 292008, at *13 (S.D. Ohio Jan. 26, 2011), but have reached as high as 10 in appropriate cases, *see Manners v. Am. Gen. Life Ins. Co.*, 1999 WL 33581944, at *31 (M.D. Tenn. Aug. 11, 1999). Just as the results, risk, and skill of counsel support the reasonableness of the requested fees under the percentage method, they also justify a multiplier of the base value of Class Counsel's services.

Here, the requested fee of $337,750 represents a multiplier of between 1.25 and 1.46 (depending on the amount of work going forward), which falls on the low end of the range of multipliers that are typically approved in this District and Circuit, including in other PPPA cases. *See, e.g., Moeller*, No. 5:16-cv-11367, dkt.

---

approval of the Settlement and the claims administration process, and addressing any potential objections. (Scharg Decl. ¶ 17.)

[7] These factors closely track the *Ramey* criteria used to assess reasonableness, discussed in detail above. (*See supra* § III.B.)

37 at 24 (approving a fee request that represented a multiplier of between 4.8 and 4.9); *Perlin*, No. 16-cv-10635, dkt. 53 at 39 (approving a fee request that represented a multiplier of 3.4); *Kinder*, No. 13-cv-11284, dkt. 77 at 36 (approving a fee request that represented a multiplier of 2.6). Such a multiplier is more than justified in this case given the complexity of the litigation, the work performed, and the outstanding relief secured for the Settlement Classes. (Scharg Decl. ¶¶ 4–15.) *See Merkner v. AK Steel Corp.*, 2011 WL 13202629, at \*5 (S.D. Ohio Jan. 10, 2011) (finding multiplier of 5.3 "acceptable under the facts and circumstances of this case" and collecting cases awarding multipliers between 4.5 and 8.74).

Thus, the value of Class Counsel's services on an hourly basis supports the reasonableness of the requested fees here.

### C.     The Requested Incentive Awards Reflect Plaintiffs' Active Involvement in This Action and Should Be Approved.

Incentive awards are frequently awarded in common-fund cases within this Circuit. *See Hadix v. Johnson*, 322 F.3d 895, 897-98 (6th Cir. 2003). The approval of an incentive award is examined through the following factors: (1) the class representative's actions in protecting the class's interests and whether those actions resulted in a substantial benefit to the class; (2) any direct or indirect financial risk the class representative assumed; and (3) the time and effort the class representative dedicated to the action. *Lasalle Town Houses Coop Assoc. v. City of Detroit*, 2016 WL 1223354, at \*7 (E.D. Mich. Mar. 29, 2016).

29

Based on these factors, an incentive award of $5,000 for each Class Representative is reasonable. It's equal to the amount awarded to the class representatives in *Halaburda*, No. 12-cv-12831, dkt. 68, *Moeller*, No. 5:16-cv-11367, dkt. 42, *Perlin*, No. 16-cv-10635, dkt. 55, and *Higgins*, No. 2:15-cv-13769, dkt. 81, and half the amount awarded in *Kinder*, No. 13-cv-11284, dkt. 81. It's also a fraction of amounts often awarded in comparable settlements. *See, e.g.*, *In re CMS Energy ERISA Litig.*, 2006 WL 2109499, at *3 (E.D. Mich. June 27, 2006) (awarding three class representatives $15,000 each for contributions to the case, including providing information to class counsel, reviewing documents, assisting with discovery, and participating in settlement discussions).

That said, the Sixth Circuit continues to express concern that incentive awards unjustly disproportionate to the named plaintiffs' work and effort can create an incentive to act against the class's best interests. *See In re Pampers Dry Max Litig.*, 724 F.3d 713, 718 (6th Cir. 2013). But this problem is most acute where paltry settlements are made functionally unavailable to a class, or where a settlement contains no common fund at all. *See, e.g.*, *id.* at 716-17 (denying an incentive award where unnamed class members could not opt out of the settlement, and the likelihood of class members actually being able to take advantage of the monetary or injunctive relief was highly unlikely); *Hadix*, 322 F.3d at 898 (describing it as "plainly inappropriate" to grant an incentive award without a

common fund to draw it from). To avoid situations where a named plaintiff's receipt of a "bounty" acts as a disincentive for the class representative to act fairly, "[class] counsel must provide the district court with specific documentation . . . of the time actually spent on the case by each recipient of an award" so that the court can be sure that the award is designed as compensation, not a windfall. *Shane Grp., Inc. v. Blue Cross Blue Shield of Michigan*, 825 F.3d 299, 311 (6th Cir. 2016).

As documented in their declarations, Ms. Raden and Ms. Moore each spent approximately 15 hours protecting and advancing the interests of the classes through their involvement in this case. (Declaration of Alice Raden ["Raden Decl."], ¶ 9, attached hereto as Exhibit 3); (Declaration of Bobbie Moore ["Moore Decl."], ¶ 9, attached hereto as Exhibit 4.) Ms. Raden and Ms. Moore assisted Class Counsel in preparing the Complaint, by detailing their magazine subscription histories, carefully reviewing the Complaint for accuracy, and giving their approvals before filing. (Raden Decl. ¶ 3; Moore Decl. ¶ 3; Scharg Decl. ¶ 20.) Further, Ms. Raden and Ms. Moore gathered and preserved any documents related to their *Martha Stewart Living* magazine subscriptions that would potentially need to be turned over to Defendants in discovery, and assisted with providing initial disclosures. (Raden Decl. ¶ 4; Moore Decl. ¶ 4; Scharg Decl. ¶ 20.) Plaintiffs also actively conferred with counsel via telephone multiples times throughout the litigation of their claims to discuss the status of the case, pending motions, case

31

strategy, and the prospects of settlement. (Raden Decl. ¶ 5; Moore Decl. ¶ 5; Scharg Decl. ¶ 21.) As a direct result of their participation, Class Counsel was able to secure the monetary and prospective relief for the class, which is readily available for class members to take advantage of, as evidenced by the thousands of Claim Forms already submitted, and the fact that Defendants have already stopped disclosing the Settlement Classes' personal reading information. Their incentive payments of $5,000 each are not a "bounty" and should be approved.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court (1) approve attorneys' fees in the amount of $337,750, (2) grant Ms. Raden and Ms. Moore incentive awards of $5,000 each in recognition of their efforts on behalf of the Settlement Classes, and (3) award such other and further relief as the Court deems reasonable and just.[8]

Respectfully submitted,

Dated: June 3, 2019

**ALICE RADEN** and **BOBBIE MOORE**, individually and on behalf of the settlement classes

By: /s/ Ari J. Scharg
One of Plaintiffs' attorneys

---

[8]    Plaintiffs will submit a single proposed order relating to their request for attorneys' fees, expenses, and incentive awards and their request for final approval of the Settlement when they file their motion for final approval on July 17, 2019.

Ari J. Scharg
ascharg@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596.1111
Fax: (248) 671.0335

*Settlement Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, hereby certify that on June 3, 2019, I served the above and foregoing *Plaintiffs' Motion for and Brief in Support of Attorneys' Fees, Expenses, and Incentive Awards* on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

/s/ Ari J. Scharg_____