# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALICE RADEN and BOBBIE MOORE, individually and on behalf of the settlement classes, | Case No.: 4:16-cv-12808 |
| | Hon. Linda V. Parker |
| Plaintiffs, | |
| v. | |
| MARTHA STEWART LIVING OMNIMEDIA, INC., a Delaware corporation, and MEREDITH CORPORATION, an Iowa corporation. | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR AND BRIEF IN SUPPORT OF
## <u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>

<u>**Respectfully submitted by:**</u>

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596-1111
Fax: (248) 671-0335

*Counsel for Plaintiffs and the Settlement Classes*

**PLAINTIFFS' MOTION FOR**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Plaintiffs Alice Raden and Bobbie Moore respectfully move the Court to grant their Motion for Final Approval of Class Action Settlement. Specifically, Plaintiffs request that the Court find that (i) the notice to the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class (the "Settlement Classes") satisfies the requirements of Due Process and Federal Rule of Civil Procedure 23, and (ii) the Settlement is fair, reasonable, and adequate meriting final approval. In accordance with Local Rule 7.1(a), Class Counsel conferred with counsel for Defendants Martha Stewart Living Omnimedia, Inc. and Meredith Corporation on July 17, 2019. Defendants will not oppose, and in fact agree with, the relief sought by this Motion. (*See* Parties' Class Action Settlement Agreement, ¶¶ 7.1-7.3, 10.1.).[1]

For the reasons discussed in the accompanying brief, the Motion should be granted.

---

[1]    A copy of the Parties' Class Action Settlement Agreement ("Settlement" or "Agreement") is attached hereto as Exhibit 1. Except as otherwise indicated, all defined terms used herein shall have the same meanings ascribed to them in the Parties' proposed Settlement Agreement.

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## STATEMENT OF ISSUES PRESENTED

1.      Whether this Court should find that notice to the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class satisfies the requirements of Due Process and Federal Rule of Civil Procedure 23, when direct notice, detailing the terms of the Settlement Agreement and individual options for objecting, opting-out, or submitting a claim, was transmitted via email and U.S. Mail postcard reaching approximately 97% of the Settlement Classes?

**Plaintiffs' Answer: Yes.**

2.      Whether this Court should grant final approval to the Settlement Agreement under Michigan's Preservation of Personal Privacy Act, M.C.L. § 445.1711-15 ("PPPA") finding it fair, reasonable, and adequate, when it delivers meaningful prospective relief to both the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class and significant monetary relief to the Direct Purchaser Settlement Class?

**Plaintiffs' Answer: Yes.**

## <u>CONTROLLING AND MOST IMPORTANT AUTHORITY</u>

**UNITED STATES SUPREME COURT CASES:**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)

**UNITED STATES COURT OF APPEALS CASES:**

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016)

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007)

**UNITED STATES DISTRICT COURT CASES:**

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831 (E.D. Mich. 2015)

*Higgins v. TV Guide Magazine, LLC*,
    No. 2:15-cv-13769 (E.D. Mich. Dec. 19, 2018)

*Kinder v. Meredith Corp.*,
    No. 14-cv-11284 (E.D. Mich. May 18, 2016)

*Leonhardt v. ArvinMeritor, Inc.*,
    581 F. Supp. 2d 818 (E.D. Mich. 2008)

*Perlin v. Time Inc.*,
    No. 2:16-cv-10635 (E.D. Mich. Oct. 15, 2018)

**OTHER AUTHORITIES:**

Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process
    Checklist and Plain Language Guide (2010)

Fed. R. Civ. P. 23

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 1

II. SUMMARY OF THE LITIGATION ........................................ 4

    A.  Plaintiffs' Allegations and the PPPA ................................. 4

    B.  The Road to the Settlement Agreement ........................... 6

III. TERMS OF THE SETTLEMENT AGREEMENT ................... 10

    A.  Class Definitions ........................................................ 10

    B.  Monetary Relief .......................................................... 10

    C.  Prospective Relief ....................................................... 11

    D.  Payment of Notice and Settlement Administration
        Expenses ................................................................... 11

    E.  Payment of Incentive Award, Attorneys' Fees,
        and Expenses ............................................................. 12

    F.  Release ..................................................................... 12

IV. THE NOTICE PLAN COMPORTS WITH DUE PROCESS ...... 12

V.  THE SETTLEMENT WARRANTS FINAL APPROVAL .......... 15

    A.  Plaintiff Raden, Plaintiff Moore, and Class Counsel Have
        Adequately Represented the Settlement Classes ............ 16

    B.  The Settlement Was Negotiated at Arm's Length and Is Free
        from Fraud and Collusion ............................................ 20

    C.  The Settlement Treats Members of the Respective Settlement
        Classes Equally .......................................................... 21

**D.**     **The Relief Secured for the Settlement Classes is Adequate and Warrants Final Approval** ........................................................ 25

    *1.*     *The Costs, Risks, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval* .................................................................................... 25

    *2.*     *The Method of Distributing Relief to the Direct Purchaser Settlement Class Members Is Effective and Supports Final Approval* ........................................................................ 31

    *3.*     *The Terms of the Requested Attorneys' Fees Are Reasonable* ........................................................................ 34

    *4.*     *There Are No Agreements Outside the Settlement To Be Identified* ................................................................................ 35

**VI.**   **CONCLUSION** .............................................................................. 36

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................. 12

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ................................................................. 22

*Spokeo v. Robbins*,
    136 S. Ct. 1540 (2016).................................................................. 7

**United States Appellate Court Cases**

*Coulter-Owens v. Time, Inc.*,
    No. 16-1321 (6th Cir. 2016) ........................................... 26

*Coulter-Owens v. Time, Inc.*,
    No. 16-1380, 695 F. App'x 117 (6th Cir. 2017)........................................... 26

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) ................................................ 13

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ........................................... 13, 21, 33

*Granada Invs., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) .................................................. 16

*In re Pampers Dry Max Litig.*,
    724 F.3d 713 (6th Cir. 2013) ...................................................... 24

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) ................................................ 4, 29

*Pelzer v. Vassalle*,
    655 F. App'x 352 (6th Cir. 2016)................................................. 35

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615, 630 (6th Cir. 2007) ...................................................... 13, 15, 25

*Vassalle v. Midland Funding LLC*,
    708 F.3d 747 (6th Cir. 2013) ........................................................................ 22

**United States District Court Cases**

*Coulter-Owens v. Rodale*,
    No. 14-cv-12688 (E.D. Mich.) ................................................................. 2, 29

*Coulter-Owens v. Time, Inc.*,
    308 F.R.D. 524 (E.D. Mich. 2015) ........................................................ 26, 27

*Coulter-Owens v. Time, Inc.*,
    2016 WL 612690 (E.D. Mich. Feb 16, 2016).............................................. 26

*Dick v. Sprint Commc'ns Co. L.P.*,
    297 F.R.D. 283 (W.D. Ky. 2014) ........................................................ 13, 20

*Fraley v. Facebook, Inc.*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013).......................................................... 4

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831 (E.D. Mich. Jan. 6, 2015) ...................................... 3, 29, 30

*Halliday v. Weltman, Weinber & Reis Co., L.P.A.*,
    2013 WL 692856 (E.D. Mich. Feb. 26, 2013)............................................. 15

*Higgins v. TV Guide, LLC*,
    No. 2:15-cv-13769 (E.D. Mich. Dec. 19, 2018)................................ 3, 29, 34

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
    2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ........................................... 13

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    312 F.R.D. 36 (D.N.H. 2015) ...................................................................... 27

*In re Google Buzz Privacy Litig.*,
    2011 WL 7460099 (N.D. Cal. Jun. 2, 2011) ................................................. 4

*In re Netflix Privacy Litig.*,
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .......................................... 4, 29

*In re LivingSocial Mktg. & Sales Practice Litig.*,
  298 F.R.D. 1 (D.D.C. 2013) .......................................................... 35

*In re Telectronics Pacing Sys., Inc.*,
  137 F. Supp. 2d 985 (S.D. Ohio 2001) .............................................. 26

*IUE-CWA v. Gen. Motors Corp.*,
  238 F.R.D. 583 (E.D. Mich. 2006) ................................................ 16, 20, 21

*In re: Whirlpool Corp. Front-loading Washer Prod. Liab. Litig.*,
  2016 WL 5338012 (N.D. Ohio Sept. 23, 2016) ..................................... 31, 35

*Kinder v. Meredith Corp.*,
  No. 14-cv-11284 (E.D. Mich. May 18, 2016) ........................................ 3, 29

*Kogan v. AIMCO Fox Chase, L.P.*,
  193 F.R.D. 496 (E.D. Mich. 2000) ................................................. 20

*Leonhardt v. ArvinMeritor, Inc.*,
  581 F. Supp. 2d 818 (E.D. Mich. 2008) ........................................... 15, 21, 25

*Mitchell v. Indep. Home Care, Inc.*,
  2019 WL 696941 (S.D. Ohio Feb. 20, 2019) ........................................ 17, 19

*Moeller v. Am. Media, Inc.*,
  No. 5:16-cv-11367 (E.D. Mich. Jun. 8, 2017) ...................................... 3, 29

*Perlin v. Time Inc.*,
  No. 2:16-cv-10635 (E.D. Mich. Oct. 15, 2018) ..................................... 3

*Sheick v. Auto Component Carrier, LLC*,
  2010 WL 3070130 (E.D. Mich. Aug. 2, 2010) ....................................... 20

*Snyder v. Ocwen Loan Servicing, LLC*,
  2018 WL 4659274 (N.D. Ill. Sept. 28, 2018) ...................................... 17

*Stinson v. Delta Mgmt. Assocs., Inc.*,
302 F.R.D. 160 (S.D. Ohio 2014).................................................... 26

**Statutory Provisions**

M.C.L. § 445.1712 ...................................................................... 6

M.C.L. § 445.1715 ...................................................................... 6

S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018) ......................................... 28

**Other Authorities**

Fed. Judicial Ctr., Judges' Class Action Notice and Claims
Process Checklist and Plain Language Guide 3 (2010) ............................... 13

Fed. R. Civ. P. 23 .................................................................... *passim*

*Privacy: Sales, Rentals of Videos, etc.*,
House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989 ...................... 6

## I.   INTRODUCTION

On April 12, 2019, this Court preliminarily approved the proposed Class Action Settlement Agreement between Plaintiffs Alice Raden and Bobbie Moore ("Plaintiffs") and Defendants Martha Stewart Living Omnimedia, Inc. ("MSLO") and Meredith Corporation ("Meredith") (together, "Defendants") (collectively, the "Parties"), and directed that notice be sent to the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class (the "Settlement Classes"). (Dkt. 48.) The Settlement Administrator has completed the Court-approved notice plan, and direct notice has reached over 97% of the Settlement Classes. The reaction to the Settlement, which resolves Plaintiffs' and the Settlement Classes' claims under the Preservation of Personal Privacy Act ("PPPA") and for unjust enrichment, has been overwhelmingly positive: of the approximately 136,600 members of the Settlement Classes, not a single one objected to the Settlement, only nine (or 0.007%) have requested to be excluded, and more than 13% of the Direct Purchaser Settlement Class have already submitted claims for payment. Given the complete lack of opposition to the Settlement's terms and the overwhelmingly positive response from the Settlement Classes, the Court should have no hesitation in granting final approval to the Settlement.

The Settlement's strength largely speaks for itself: it creates a $965,000.00 non-reversionary common fund from which Direct Purchaser Settlement Class

Members' claims, notice and administrative expenses, Court-awarded attorneys' fees, and an incentive award to the Class Representatives will be paid. In terms of individual relief, each Direct Purchaser Settlement Class Member that submits a short and simple Claim Form (either in online or in hard-copy), will receive an estimated cash payment of $60. And, just as important, the Settlement delivers strong prospective relief to both the Settlement Classes by requiring Defendants to (i) stop disclosing their Michigan customers' personal reading information to third party companies for a period of three years and (ii) perform annual audits to ensure their compliance with the Settlement. Put simply, the Settlement achieves the paramount goals of this lawsuit: providing monetary relief to the Direct Purchaser Settlement Class for their PPPA claims and stopping the unauthorized disclosure of the Settlement Classes' choice of reading materials.

Ultimately, while the strength of the Settlement should be apparent on its face, the Court need not evaluate the Settlement in a vacuum. Indeed, a review of previous PPPA settlements in this District demonstrates that the Settlement compares favorably to those previously approved by the court—an exceptional result considering that Plaintiffs' PPPA claims (which carried statutory penalties) were dismissed at the pleadings stage. *See, e.g.*, *Coulter-Owens v. Rodale*, No. 14-cv-12688, dkt. 54 (E.D. Mich. Sept. 29, 2016) (securing a $4.5 million fund for a class of approximately 580,000 magazine subscribers with claiming class members

receiving a *pro rata* payment of approximately $44); *Perlin v. Time Inc.*, No. 2:16-cv-10635, dkt. 55 (E.D. Mich. Oct. 15, 2018) (securing a $7.4 million fund for a class of approximately 600,000 magazine subscribers under PPPA with claiming class members receiving an estimated $50); *Kinder v. Meredith Corp.*, No. 14-cv-11284, dkt. 81 (E.D. Mich. May 18, 2016) (securing a $7.5 million fund for a class of approximately 980,000 magazine subscribers with claiming class members receiving a *pro rata* payment of approximately $50); *Higgins v. TV Guide, LLC*, No. 2:15-cv-13769, dkt. 81 (E.D. Mich. Dec. 19, 2018) (securing a $1.7 million fund for a class of approximately 90,000 magazine subscribers under PPPA with claiming class members receiving a *pro rata* payment of approximately $60); *Halaburda v. Bauer Publ'g Co.*, No. 12-cv-12831, dkt. 68 (E.D. Mich. Jan. 6, 2015) (securing a $775,000 fund for a class of 40,000 magazine subscribers with claiming class members receiving a *pro rata* payment of approximately $74); *Moeller v. Am. Media, Inc.*, No. 5:16-cv-11367, dkt. 42 (E.D. Mich. Jun. 8, 2017) (securing a $7.6 million fund for a class of 415,000 magazine subscribers with claiming class members receiving an estimated $100).

And when compared to approved settlements of cases alleging violations of similar privacy statutes with statutory damage awards—which typically offer no monetary relief to the class whatsoever—the fairness, reasonableness, and adequacy of the instant Settlement becomes even more apparent. *See, e.g.*, *Lane v.*

*Facebook, Inc*., 696 F.3d 811, 820–22 (9th Cir. 2012) *cert. denied*, 571 U.S. 1003 (2013) (approving a settlement of federal Video Privacy Protection Act ["VPPA"] claims, and directing $9.5 million to *cy pres* as the sole form of monetary relief); *In re Netflix Privacy Litig*., 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013) (approving $9 million *cy pres* settlement of VPPA claims); *In re Google Buzz Privacy Litig*., 2011 WL 7460099, at *3 (N.D. Cal. Jun. 2, 2011) (approving $8.5 million *cy pres* settlement); *Fraley v. Facebook, Inc*., 966 F. Supp. 2d 939, 943 (N.D. Cal. 2013) (approving privacy settlement providing claimants with a cash payment of $15).

For these reasons, and those discussed further below, Plaintiffs respectfully request that the Court grant final approval to the Parties' proposed Class Action Settlement Agreement.

## II.   SUMMARY OF THE LITIGATION

Plaintiffs' allegations, the litigation history, and the events leading up to the Settlement provide context for its fairness, reasonableness, and adequacy.

### A.   Plaintiffs' Allegations and the PPPA.

Defendant MSLO, an entertainment and media company, and Defendant Meredith, an American magazine publisher, work together to market and sell the widely popular magazine titles *Martha Stewart Living* and *Martha Stewart Weddings*. (*See* Plaintiffs' Class Action Complaint, dkt. 1 ["Compl."] ¶ 1.)

4

Plaintiffs allege that MSLO and Meredith don't just make money selling magazines and advertising space—they make additional profit by selling the fact their subscribers' read their magazines. (*Id.* ¶¶ 2, 24, 26–28, 63–65, 72.) And instead of simply selling lists of names that subscribe to certain magazines, Plaintiffs allege that Defendants offer for sale something far more valuable: customers' magazine reading choices along with additional data about their income level, religion, age, race, political affiliations, travel habits, medical conditions, and other sensitive, personal information. (*Id.* ¶¶ 2, 21, 24, 28, 39, 49, 72.) Defendants allegedly obtain this demographic and lifestyle data about its customers from data miners and other third parties by offering its subscriber lists in exchange for the supplemental demographic data. (*Id.*)

Of course, none of this is illegal if a magazine publisher informs its subscribers about what it is doing and gets consent to disclose the information. *See* M.C.L. § 445.1713. The problem is, Plaintiffs allege, Defendants' subscribers never provided consent for MSLO or Meredith to disclose information to third parties related to the magazines that they were reading. (*Id.* ¶¶ 3, 29, 34–40, 44–50, 68, 69.)

On July 31, 2016, Plaintiffs Alice Raden and Bobbie Moore initiated this suit. (Dkt. 1.) Plaintiffs allege that at no time did they consent to allow Defendants to disclose their magazine subscription choices to any third parties, but Defendants

disclosed that information anyway. (Compl. ¶¶ 34–40, 44–50.) They further allege
that this conduct violates the PPPA, which prohibits retailers, publishers, and other
entities engaged in the business of selling written materials at retail from disclosing
records or information concerning the purchase of those materials by a customer
that indicates the identity of the customer. M.C.L. § 445.1712. The Michigan
legislature rightfully recognized that a person's choice in reading materials "is
nobody's business but one's own," and passed the PPPA "to explicitly protect a
consumer's privacy in buying and borrowing" such materials. *Privacy: Sales,
Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. 5331, Jan. 20,
1989. Given the importance of reader privacy, the PPPA, in its original form,
provided for statutory damages of $5,000 per violation, plus costs and reasonable
attorney fees. *See* M.C.L. § 445.1715. A 2016 amendment to the law, however,
removed the statutory-damages provision prospectively. *Id.*

## B. The Road to the Settlement Agreement.

At the time this case was filed, there was a considerable amount of
uncertainty in the PPPA legal landscape. Pending in the Sixth Circuit was an
appeal in *Coulter-Owens v. Time, Inc.*—a similar PPPA case against a magazine
publisher—regarding (i) whether a plaintiff has Article III standing to pursue her
PPPA claims when she alleges no actual damages (as Plaintiffs allege here) and (ii)
when and from who an individual purchases a magazine "at retail" and thus is

entitled to invoke the PPPA's protections. *See Coulter-Owens v. Time, Inc.*, No. 16-1321, *appeal docketed*, Mar. 17, 2016 (6th Cir.). To make matters more unclear, on the day Plaintiffs filed suit on July 31, 2016, an amendment to the PPPA came into effect that removed the Act's statutory damages provision, meaning only actual damages were available under the Act going forward.

In light of this murky legal landscape, Defendants mounted a vigorous defense from the outset. Defendants' initial attack came when they moved to dismiss, arguing (i) that Plaintiffs lacked Article III standing because they had suffered no cognizable injury, (ii) that Plaintiffs could not state a claim under the PPPA because the amendment requiring actual damages applied retroactively to their claims, and (iii) that Defendants were not unjustly enriched by their disclosure practices. (Dkt. 11.) Plaintiffs opposed the motion arguing that the amended PPPA only applies prospectively to claims that, unlike Plaintiffs', accrued after its effective date, and that Defendants misunderstood *Spokeo v. Robbins*, 136 S. Ct. 1540 (2016), which actually confirmed that Plaintiffs have Article III standing because Defendants' undisputed disclosure of their personal reading choices was an invasion of their legally protected privacy interests. (Dkt. 12.)

Before the Court ruled on the pending motion, the Sixth Circuit issued its decision in the *Coulter-Owens* appeal. The Sixth Circuit concluded that consumers

generally have standing to sue over alleged disclosures of personal information in violation of the PPPA because such an act violates the consumer's substantive privacy rights created by the PPPA and because the actual-damages requirement in the amended PPPA did not apply retroactively. 695 F. App'x 117, 120-21 (6th Cir. 2017). In considering the statute's "at retail" limitation, the court also held that the PPPA's private right of action applies only to sales made by defendants directly to customers, and not to sales made through third-party subscription agents. *Id.* at 122-24.

On July 20, 2017, this Court granted Defendants' motion to dismiss in part. Citing the Sixth Circuit's *Coulter-Owens* decision, the Court concluded that Plaintiffs had standing because they alleged an invasion of their substantive legal interests. (Dkt. 23 at 6-7.) The Court, however, dismissed Plaintiffs' PPPA claims under the newly amended statute, concluding that the appropriate date to determine whether a statute applies retroactively is the date the lawsuit is filed, rather than the date the cause of action accrues. (*Id*. at 7-10.) Plaintiffs' claims for unjust enrichment, on the other hand, were allowed to move forward. (*Id.* at 10-11.) On August 3, 2017, Defendants separately answered the remaining allegations of the Complaint, each denying the claims and raising numerous affirmative defenses. (Dkts. 25, 26.)

On August 7, 2017, Plaintiffs moved the Court to partially reconsider its Order dismissing their PPPA claims. (Dkt. 27.) Plaintiffs argued that their claims are not subject to the amended PPPA, and thus should not have been dismissed for failure to allege "actual damages", because their claims accrued before the statute was amended, and the accrual date—not the date the complaint was filed—controls. (*Id*.) After full briefing, the court denied Plaintiffs' motion. (Dkt. 30.)

The Parties then exchanged initial disclosures, and soon after, began engaging in settlement discussions and exchanging informal discovery related to, *inter alia*, the size and composition of the putative class. (*See* Declaration of Ari J. Scharg in Support of Plaintiff's Motion for Final Approval of Class Action Settlement ["Scharg Decl."], attached hereto as Exhibit 2, ¶ 4.) While still discussing the possibility of early resolution, the Parties filed a joint discovery plan, the Court entered a Scheduling Order, and the Parties were referred to a magistrate judge for a settlement conference. (Dkts. 40–43.)

Over the following months, the Parties continued their settlement discussions in an effort to resolve the case without the expense of further litigation, which would necessarily include adversarial class certification, summary judgment briefing, and appeals. (Scharg Decl. ¶ 5.) During these discussions, the Parties explored what a settlement resolving the claims of both direct and indirect subscribers might look like, resulting in Defendants providing further informal

9

discovery regarding the number of direct and indirect subscribers and from whom they purchased their subscriptions. (*Id.* ¶ 6.) With that information in hand, and after multiple rounds of arm's-length negotiations between counsel experienced in valuing and negotiating PPPA class settlements, the Parties ultimately reached an agreement on the principal terms of the Settlement. (*Id.*) The Parties then diligently prepared and executed the written Settlement Agreement, which the Court preliminarily approved on April 12, 2019. (*Id.* ¶ 7; dkt. 48.)

## III.   TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement Agreement are briefly summarized as follows:

### A.   Class Definitions

As part of preliminary approval, the Court certified two Settlement Classes defined as follows:

> **Direct Purchaser Settlement Class:** All persons with Michigan Street addresses who were subscribers to *Martha Stewart Living* magazine or *Martha Stewart Weddings* magazine between July 31, 2010 and July 31, 2016 and who purchased their subscriptions directly from Martha Stewart or Meredith.

> **Indirect Purchaser Settlement Class:** All persons with Michigan Street addresses who were subscribers to *Martha Stewart Living* magazine or *Martha Stewart Weddings* magazine between July 31, 2010 and July 31, 2016 and who purchased their subscriptions from a third party.

(Dkt. 48 at 2–3.)

**B.     Monetary Relief**

Defendants have established a $965,000.00 non-reversionary Settlement

Fund, from which each Direct Purchaser Settlement Class Member who submits an

Approved Claim shall be entitled to a *pro rata* share, after payment of notice and

administrative expenses, attorneys' fees, and any incentive awards to the Class

Representatives. (Agreement ¶¶ 1.33, 2.1.) Individual payments are estimated to be

approximately $60. (Scharg Decl. ¶ 8.)

**C.     Prospective Relief**

For a period of three years from April 12, 2019 (the date the Court entered

its Preliminary Approval Order), and in accordance with the Settlement

Agreement, Defendants will not disclose any Michigan customers' subscription

information to third-party companies without their prior express written consent.

(Agreement ¶ 2.2.). Further, Defendants have agreed to perform annual audits of

their procedures to ensure that they are complying with their obligations under the

Settlement, and will correct any deficiencies identified in these audits. (*Id.*)

**D.     Payment of Notice and Settlement Administration Expenses**

Defendants have paid, and will continue to pay, all notice and Settlement

Administration Expenses out of the Settlement Fund. (*Id.* ¶¶ 1.31, 1.33.) To date,

Settlement Administration Expenses, including the cost of notice, have totaled

$66,112.63. (Declaration of Joseph F. Mahan ["Mahan Decl."] ¶ 19, attached hereto as Exhibit 3.)

### E.    Payment of Incentive Award, Attorneys' Fees, and Expenses

Defendants have agreed to pay an incentive award from the Settlement Fund to Plaintiff Alice Raden and Plaintiff Bobbie Moore in the amount of $5,000 each to compensate them for their service as Class Representatives, as well as reasonable attorneys' fees not to exceed 35% of the Settlement Fund. (Agreement ¶¶ 1.33, 8.1, 8.3.) Both awards are subject to the Court's approval, which Plaintiffs have petitioned for separately. (*See* dkt. 50.)

### F.    Release

In exchange for the relief described above, Defendants and each of their related and affiliated entities will receive a full release of all claims arising out of or related to Defendants' disclosure of their Michigan customers' magazine subscription information. (*See* Agreement ¶¶ 1.28–1.30 for full release language.)

## IV.    THE NOTICE PLAN COMPORTS WITH DUE PROCESS.

Before final approval can be granted, Due Process and Rule 23 require that the notice provided to the Settlement Classes is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Rule 23 instructs litigants to provide notice

to the class via "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2)(B) (eff. Dec. 1, 2018). The notice "must clearly and concisely state in plain, easily understood language" essential information regarding the settlement, including the nature of the action, terms of the settlement, and class members' options. *See id.*; *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 292 (W.D. Ky. 2014). At its core, "[a]ll that the notice must do is fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interest." *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (citation omitted).

That said, Due Process does not require that every class member receive notice, and a notice plan is reasonable if it reaches at least 70% of the class. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010); *see also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *12 (W.D. Ky. Dec. 22, 2009) (finding notice plan to be "the best notice practicable" where combination of mail and publications notice reached 81.8% of the class); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 289 (6th Cir. 2016) (finding that notice and claims processes were appropriate where 90.8% of notices were successfully delivered to addresses associated with class

members). The notice plan here easily satisfies these standards, as it provided

direct notice via email or postcard to over 97% of the Settlement Classes.

At preliminary approval, the Court approved the Parties' proposed Notice

Plan, finding it met the requirements of Rule 23 and Due Process. (Dkt. 48 at 5–6.)

That plan has now been fully carried out by professional settlement administrator

Heffler Claims Group LLC ("Heffler"). Pursuant to the Settlement, Meredith

provided Class Counsel and Heffler with a list of 136,609 available names,

addresses, and emails of potential members of the Settlement Classes. (Agreement

¶ 4.1(a)); Mahan Decl. ¶ 5.) Heffler sent the Court-approved notice to every

member of the Settlement Classes, which was successfully delivered via email to

61,224 class members and via postcard to another 71,824 class members. (Mahan

Decl. ¶ 10–12.) Accordingly, direct notice of the Settlement was successfully

delivered to over 97% of the Settlement Classes. (*Id.* ¶¶ 11–13.)[2] These summary

notices also directed members of the Settlement Classes to a Settlement Website,

www.MSLmagazinesettlement.com, where they are able to view the long form

notice; access important court filings, including the Motion for Attorneys' Fees,

(dkt. 75); and see deadlines and answers to frequently asked questions. (Agreement

¶ 4.1(d)); (Mahan Decl. ¶¶ 7, 10.) The Settlement Website also allows Direct

---

[2] Heffler also timely notified the appropriate state and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715. (Mahan Decl. ¶ 4.)

Purchaser Settlement Class Members to submit claims online up until September

14, 2019. (Agreement ¶ 4.1(d)); (Mahan Decl. ¶¶ 7, 10.)

Given the broad reach of the notice, and the comprehensive information

provided in plain language, the requirements of Due Process and Rule 23 are met.

## V.     THE SETTLEMENT WARRANTS FINAL APPROVAL.

The Federal Rules of Civil Procedure require judicial approval of class

action settlements. Fed. R. Civ. P. 23(e); *Halliday v. Weltman, Weinber & Reis*

*Co., L.P.A.*, 2013 WL 692856, at *1 (E.D. Mich. Feb. 26, 2013). At final approval,

the ultimate issue is whether the settlement is fair, reasonable, and adequate. Fed.

R. Civ. P. 23(e)(2). Courts within the Sixth Circuit recognize a strong "federal

policy favoring settlement of class actions." *UAW*, 497 F.3d at 632 (citation

omitted); *see Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 830 (E.D.

Mich. 2008).

To evaluate the fairness, reasonableness, and adequacy of a settlement

agreement at final approval, Rule 23(e)(2) directs courts to consider whether: (1)

the class representatives and class counsel have adequately represented the class;

(2) the settlement was negotiated at arm's length; (3) the settlement treats class

members equitably relative to each other; and (4) the relief provided for the class is

adequate. Fed. R. Civ. P. 23(e)(2) (eff. Dec. 1, 2018).[3] As described below, each

factor affirms the fairness, reasonableness, and adequacy of the Settlement, and

therefore weighs in favor of final approval.

### A.   Plaintiff Raden, Plaintiff Moore, and Class Counsel Have Adequately Represented the Settlement Classes.

The first Rule 23(e)(2) factor considers whether the class representatives and

class counsel have adequately represented the class. Fed. R. Civ. P. 23(e)(2)(A).

The focus of this analysis is "on the actual performance of counsel acting on behalf

of the class" throughout the litigation. Fed. R. Civ. P. 23(e) advisory committee's

note to 2018 amendment. In considering this factor, courts should examine whether

plaintiff and class counsel had adequate information to negotiate a class-wide

settlement, taking into account the nature and amount of discovery completed. *Id.*

What is imperative is not the amount of *formal* discovery completed, but whether

---

[3]   Federal Rule of Civil Procedure 23 was amended on December 1, 2018 to refine the standards for approval of proposed class action settlements under Rule 23(e)(2). Notably, the factors to be considered under the amended Rule 23 are substantially similar to the "*UAW* factors" previously considered for final settlement approval in the Sixth Circuit. *See UAW*, 497 F.3d at 631 (considering (1) the likelihood of success on the merits; (2) the public interest; (3) the complexity, expense, and duration of future litigation; (4) the opinions of class counsel; (5) the amount of discovery completed; (6) the reaction of absent class members; and (7) the risk of fraud or collusion) (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment ("The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

the parties and the court have sufficient information to make a reasoned decision with respect to settlement. *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("That the parties conducted their investigation through informal discovery . . . is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions."). Ultimately, this factor is generally satisfied where the named plaintiff participated in the case diligently, and where class counsel fought vigorously on behalf of plaintiff and the class throughout the litigation. *Snyder v. Ocwen Loan Servicing, LLC*, 2018 WL 4659274, at *3 (N.D. Ill. Sept. 28, 2018); *see Mitchell v. Indep. Home Care, Inc.*, 2019 WL 696941, at *4 (S.D. Ohio Feb. 20, 2019), *report and recommendation adopted*, 2019 WL 1125760 (S.D. Ohio Mar. 12, 2019) (holding this factor was satisfied where the parties "engaged in extensive informal discovery," including "extensive investigations into the facts before and during the prosecution," analysis of documents from the defendant, and consultation with the class representative).

Since Ms. Raden (a direct purchaser) and Ms. Moore (an indirect purchaser) filed this case, they have understood their roles as class representatives and have advocated not only for themselves but for the interests of all other class members. (Declaration of Alice Raden ["Raden Decl."], ¶ 8, attached hereto as Exhibit 4); (Declaration of Bobbie Moore ["Moore Decl."], ¶ 8, attached hereto as Exhibit 5.)

Ms. Raden and Ms. Moore have assisted Class Counsel in every aspect of this case, including by helping Class Counsel investigate their PPPA claims and prepare the Class Action Complaint and Demand for Jury Trial, preserving documents, conferring with Class Counsel throughout the litigation, and reviewing and approving the Settlement Agreement before signing it. (Raden Decl. ¶¶ 3–6; Moore Decl. ¶¶ 3–6). Given their efforts and aligned interests with the classes, there can be no doubt that Ms. Raden and Ms. Moore have only acted in the best interests of the Direct Purchaser Settlement Class and Indirect Purchaser Settlement Class and have adequately represented them.

Likewise, Class Counsel's performance in this case demonstrates that their representation has been beyond adequate. As detailed above, over the past three years, Class Counsel have tirelessly prosecuted MSLO and Meredith for their alleged PPPA violations in an effort to recover monetary and prospective relief for Plaintiffs and the class. This has required Class Counsel to embark on a fact-intensive investigation of MSLO's and Meredith's practices, engage in robust Rule 12 motion practice, move the Court to reconsider its partial dismissal Order, exchange extensive informal discovery, and eventually, engage in meaningful settlement discussions and numerous rounds of arm's-length negotiations. (Scharg Decl. ¶¶ 4–6.)

The considerable amount of investigation and informal discovery completed in this case ensured that Plaintiffs and Class Counsel had adequate information to assess the strength of the case and engage in settlement discussions. Indeed, before this suit was even filed, Class Counsel's pre-suit investigation into the underlying facts of the case gave them a thorough understanding of Defendants' business practices, their methods of data collection and aggregation, and their relationships with various third-party companies. (Scharg Decl. ¶ 9.) *See Mitchell*, 2019 WL 696941, at *4 (S.D. Ohio Feb. 20, 2019) (in evaluating this factor, "the court should take account [of] . . . informal discovery in which parties engaged both before and after litigation commenced"). As the case progressed, Class Counsel gained even more knowledge through the exchange of informal discovery related to, *inter alia*, the size and composition of the putative classes, which identified MSLO's and Meredith's direct and indirect subscribers and from whom they purchased their subscriptions. (Scharg Decl. ¶ 6.) With these datapoints in hand, the Parties and their respective counsel had all the information they needed to fully understand the pertinent issues of the case and reach an informed resolution. (*Id.* ¶¶ 6, 13.)

In the end, if the Settlement is approved, the Settlement Classes will reap its valuable benefits thanks to Plaintiffs' and Class Counsel's hard work pursuing this case and representing their interests. In light of Plaintiffs' and Class Counsel's

performance, their diligent investigation into the merits of the case, and the results achieved, it is clear they have adequately represented the Settlement Classes. This factor is well satisfied.

### B.    The Settlement Was Negotiated at Arm's Length and Is Free from Fraud and Collusion.

The second Rule 23 (e)(2) factor ensures that the settlement is the "product of arm's-length negotiations as opposed to collusive bargaining." *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501-02 (E.D. Mich. 2000); *see also Sheick v. Auto Component Carrier, LLC,* 2010 WL 3070130, at *13 (E.D. Mich. Aug. 2, 2010) (explaining that arm's-length negotiations conducted "by adversarial parties and experienced counsel" are indicative of a settlement's fairness, reasonableness, and adequacy). The absence of fraud or collusion is presumed unless there is evidence to the contrary. *IUE-CWA*, 238 F.R.D. at 598. *See UAW*, 497 F.3d at 628; *Dick v. Sprint Commc'ns*, 297 F.R.D. at 295 (finding that the exchange of data through litigation and the absence of allegations of fraud or collusion indicated that the settlement was the result of "good-faith, arm's-length negotiations").

The instant settlement is the product of informed negotiations conducted at arm's length by experienced counsel representing adversarial parties after considerable litigation. (Scharg Decl. ¶ 13.) As detailed in Plaintiffs' motion for attorneys' fees, (dkt. 50 at 25), Class Counsel have built their practice upon complex consumer class action litigation and have significant experience with the

PPPA. (Scharg Decl. ¶ 11.) Likewise, defense counsel—attorneys from sophisticated law firms—have significant experience in defending leading magazine publishers in similar PPPA litigation and have at all times vigorously defended MSLO and Meredith throughout this litigation. (*Id.*) As the docket in this case reflects, the Parties have vigorously pursued their own interests and positions throughout the litigation, further confirming the absence of fraud or collusion. *See Leonhardt*, 581 F. Supp. 2d at 838; (Scharg Decl. ¶ 12.) And when both sides were finally ready to discuss the possibility of settlement, all of their negotiations occurred only at arm's-length and neither party discussed the issue of attorneys' fees at any point. (*Id.*; Agreement ¶ 8.1.) The arm's-length nature of these negotiations is further confirmed by the Settlement itself: it is non-reversionary, provides significant cash payments to Direct Purchaser Settlement Class Members, and contains no provisions that might suggest fraud or collusion, such as "clear sailing" or "kicker" clauses regarding attorneys' fees. *See Gascho*, 822 F.3d at 277; *see also IUE-CWA.*, 238 F.R.D. at 599 ("The authorities hold that if the settlement agreement itself is fair, reasonable and adequate, then the court may assume that the negotiations were proper and free of collusion.").

For these reasons, there should be no question that the Settlement here was the result of good-faith, arm's-length negotiations and is entirely free from fraud or collusion. This factor thus supports granting final approval.

**C.    The Settlement Treats Members of the Respective Settlement Classes Equally.**

The next factor under Rule 23(e)(2) considers whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). This inquiry ensures that the Settlement does not "give[] preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755 (6th Cir. 2013) (citation omitted). Notably, fair treatment among class members is "assured by straightforward pro rata distribution of the limited fund." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999).

To recap, the Settlement proposes two Settlement Classes, defined by their relationship with Defendants and the viability of their PPPA claims under current Sixth Circuit law. The first class, the Direct Purchaser Settlement Class, purchased their magazine subscriptions directly from Defendants. According to the Sixth Circuit's unpublished decision in *Coulter-Owens v. Time*, these class members have a claim for damages against Defendants under the PPPA because they purchased their subscriptions "at retail." Meanwhile, the second class, the Indirect Purchaser Settlement Class, have no claim under the PPPA since they purchased their subscriptions through third-party agents and not from Defendants "at retail" as required under *Coulter-Owens*. Accordingly, the Direct Purchaser Settlement Class Members are entitled to both monetary and prospective relief under the

Settlement, while the Indirect Purchaser Settlement Class Members are entitled to prospective relief.[4]

Nevertheless, the proposed Settlement treats each member of the respective Settlement Classes equally. In terms of monetary relief, each Direct Purchaser Settlement Class Member is entitled to a single, *pro rata* cash payment from the Settlement Fund, estimated to be $60. (Agreement ¶ 2.1; Scharg Decl. ¶ 8.) Given that each Direct Purchaser Settlement Class Member has identical PPPA claims for the same amount of statutory damages, *pro rata* distribution of the non-reversionary common fund is certainly the most equitable distribution method possible in this case. Similarly, each Direct Purchaser Settlement Class Member and Indirect Purchaser Settlement Class Member is entitled to identical prospective relief requiring Defendants to (i) stop disclosing their magazine subscription information to any third-party companies, without first obtaining their express written consent, and (ii) complete annual audits to ensure their compliance with the Settlement. (Agreement ¶ 2.2.)

The equitable treatment under the Settlement is not altered by the fact that the Settlement permits the Court to award Plaintiffs Raden and Moore a modest

---

[4]    Notably, the Settlement preserves any claims the Indirect Purchaser Settlement Class Members may have for monetary relief against the third-party agent from whom they purchased their magazine subscription—in other words, they may still sue the entity where they purchased their subscriptions "at retail" for money damages. (*See* Agreement ¶ 1.29.)

contribution award of $5,000 each to compensate them for the services they provided to ensure the class they represented obtained meaningful relief. (*See* dkt. 50; Raden Decl. ¶¶ 3–9, Moore Decl. ¶¶ 3–9.) As explained in detail in Ms. Raden's and Ms. Moore's request for a service award, here, incentive awards of $5,000 each is not a bounty or a windfall, and is in fact reasonable to compensate them for the time and effort they expended in obtaining a $965,000.00 common fund and outstanding prospective relief for the class. (Dkt. 50 at 30–32 (discussing *In re Pampers Dry Max Litig.*, 724 F.3d 713 (6th Cir. 2013) and Plaintiffs' crucial service in the case).) Modest service awards—like the one sought here—are regularly approved in this District and do not create either an adequacy issue nor indicate unfair preferential treatment when, as here, the award provides compensation for time that is spent on a case that secures meaningful relief for the class. (*See* dkt. 50.)

Simply put, all members of the Settlement Classes are being treated equally under the Settlement relative to their relationship with the Defendants, and Plaintiffs' request for a reasonable incentive award to compensate them for their efforts in securing the Settlement does not change that fact. This factor therefore also weighs in favor of final approval.

**D. The Relief Secured for the Settlement Classes is Adequate and Warrants Final Approval.**

The final and most substantive factor under Rule 23(e)(2) examines whether the relief provided for the classes is adequate. Fed. R. Civ. P. 23(e)(2)(C). In making this determination, Rule 23 instructs courts to take into account several sub-factors, including (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of the proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreements made in connection with the proposed settlement. *Id.* As explained below, each of these sub-factors demonstrate that the Settlement provides adequate relief to both Settlement Classes and should be approved.

**1. The Costs, Risks, and Delay of Further Litigation Compared to the Settlement's Benefits Favors Final Approval.**

In evaluating the adequacy of the relief provided to the classes, courts should first compare the costs, risks, and delay of pursuing a litigated outcome to the settlement's immediate benefits. Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment. Where the class has only been certified for settlement purposes, as here, courts should also consider the likelihood of certifying the class for litigation. *Id.* "Although this inquiry understandably does not require [the court] to decide the merits of the case or resolve unsettled legal questions," the fairness of

a proposed settlement cannot be judged "without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW*, 497 F.3d at 631 (citation omitted). Ultimately, the question is whether the class's interests "are better served if the litigation is resolved by the settlement." *Leonhardt*, 581 F. Supp. 2d at 836. Final approval is favored in cases such as this one, where the parties are "likely [to] expend significant time and money litigating [a] case through class certification, dispositive motions, trial, and appeal," further chipping away at the amount—and possibility—of class recovery. *Stinson v. Delta Mgmt. Assocs., Inc.*, 302 F.R.D. 160, 164 (S.D. Ohio 2014); *see In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001).

Here, Plaintiffs are well aware of the considerable costs, risks, and delay of pursing a litigated outcome. Further litigation in this case would undoubtedly produce substantially more motion practice, including an adversarial motion for class certification, motions for summary judgment, and inevitable appeals. This is especially true given that the only PPPA case in this District to be fully litigated required complex and time-consuming briefing on class certification, for summary judgment, and appeal (which affirmed a grant of summary judgment to the defendant). *See Coulter-Owens v. Time, Inc.,* 308 F.R.D. 524 (E.D. Mich. 2015) (granting class certification); *Coulter-Owens v. Time, Inc.*, 2016 WL 612690 (E.D.

Mich. Feb 16, 2016) (granting defendant's cross motion for summary judgment and dismissing plaintiff's and the class's PPPA claims); *Coulter-Owens v. Time, Inc.*, Nos. 16-1321 & 16-1380, 695 F. App'x 117 (6th Cir. 2017) (affirming the district court's summary judgment ruling).

While Plaintiffs believed their chances of reviving their dismissed PPPA claims and certifying an adversarial class (or classes) were strong, they recognized they were also far from certain. (*See* Scharg Decl. ¶ 10.) Plaintiffs would first have to attempt to certify a class based on their only surviving claims for unjust enrichment—a notoriously uncertain enterprise. *See, e.g.*, *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36, 62-63 (D.N.H. 2015) (explaining the several individualized issues inherent in any unjust-enrichment claim). If that failed, Plaintiffs would need to successfully appeal their dismissed PPPA claims in the Sixth Circuit before they could move to certify a class based on those claims. Prevailing at either of those stages, let alone both, would be a challenging feat requiring significant time and resources. Simply put, while the uniformity of MSLO's and Meredith's conduct toward the class made the case amenable to certification, *see Coulter-Owens v. Time, Inc*., 308 F.R.D. 524 (certifying class where defendant engaged in similar conduct toward its magazine subscribers), the dismissal of Plaintiffs' PPPA claims made certifying a class for litigation a costly and uncertain endeavor. *See Mitchell*, 2019 WL 696941, at *5 (finding "the

existence of uncertainties inherent in [plainitff's] claims" weighed in favor of settlement approval).

Even assuming Plaintiffs revived their PPPA claims and certified a class for litigation, there remained numerous ways in which the Settlement Classes could wind up empty-handed. And as thoroughly explained in Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (dkt. 46, at 31–36), obtaining a litigated outcome would also require Plaintiffs to (i) persuade the Sixth Circuit to overrule its unpublished decision in *Coulter-Owens*, in part, and find that indirect purchasers also purchased their subscriptions "at retail" within the meaning of the statute; (ii) defeat Defendants' numerous defenses against PPPA liability at summary judgment, including, for example, that Defendants only disclosed magazine subscription information to their agents, that the disclosures were permissible under the PPPA's "direct marketing exception," and that Defendants did not sell the magazine subscriptions "at retail"; (iii) prevail in the first-ever trial of PPPA claims; and (iv) defeat inevitable post-judgment motions over the size of any statutory damage award. (Dkt. 46, at 31–36.) Underscoring all of those risks was a bill introduced in the Michigan legislature that, if enacted, would repeal the statutory damages provision of the PPPA retroactively, meaning that even if Plaintiffs successfully revived their PPPA claims in the Sixth Circuit, the Act's

$5,000 statutory damages would not be an available remedy. *See* S.B. 984, 99th Leg. Reg. Sess. (Mich. 2018).

Against this backdrop of risk and uncertainty, the benefits of the Settlement are unmistakable. In terms of monetary relief, the Settlement's $965,000.00 non-reversionary Settlement Fund will be used to pay the Direct Purchaser Settlement Class Members *pro rata* cash payments which are estimated to be $60 per claimant. (Scharg Decl. ¶ 8.) These significant cash payments are in line with—and in many cases exceed—the payments class members have received in previous PPPA settlements approved in this district. *See, e.g., Rodale*, No. 14-cv-12688, dkt. 54 (providing approximately $44 to each claiming class member); *Perlin*, No. 16-cv-10635, dkt. 55 (providing approximately $50 to each claiming class member); *Kinder*, No. 14-cv-11284, dkt. 81 (same); *Higgins*, No. 2:15-cv-13769, dkt. 81 (providing approximately $60 to each claiming class member); *Halaburda*, No. 12-cv-12831, dkt. 68 (providing approximately $74 to each claiming class member); *Moeller*, No. 5:16-cv-11367, dkt. 42 (providing an estimated $100 to each claiming class member).

The reasonableness of the anticipated $60 *pro rata* payments becomes all the more apparent when looking at the relief afforded in the typical privacy settlement, where classes tend to be enormous, but individual class members receive only *cy pres* relief without any individual payments. *See, e.g., Lane*, 696 F.3d at 820-22

29

(affirming $9.5 million settlement providing *cy pres* relief where $10,000 statutory damages were available per claim); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099, at *3-5 (approving $8.5 million settlement providing *cy pres* relief where $10,000 statutory damages were available per claim); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6-7 (approving $9 million settlement providing *cy pres* relief where $2,500 statutory damages were available per claim).

The Settlement also delivers meaningful prospective relief for both Settlement Classes. For the next three years, Defendants are enjoined from disclosing their Michigan customers' subscriber information to third parties without prior express written consent, and must complete annual audits to ensure compliance with the Settlement. (Agreement ¶ 2.2.) This relief aligns perfectly with both the goals of the PPPA and those of this lawsuit. *See, e.g., Halaburda,* No. 12-cv-12831, dkt. 69, at 19 (finally approving a class action in similar PPPA litigation and finding that "the more important provisions of the settlement agreement are the provisions according equitable relief and a cessation of the disclosure altogether for this period of four years by the defendants").

Where, as in this case, the costs, risks, and delay of further litigation will threaten a positive outcome for the class, the benefits of the Settlement—both prospective and monetary—are readily apparent. This sub-factor thus supports final approval.

**2.** ***The Method of Distributing Relief to the Direct Purchaser Settlement Class Members Is Effective and Supports Final Approval.***

The next sub-factor evaluates whether the settlement's proposed methods of distributing relief to the classes and processing class members' claims is effective. Fed. R. Civ. P. 23(e)(2)(C)(ii). An effective claims process "strikes a proper balance between, on the one hand, avoiding fraudulent claims and keeping administrative costs low, and on the other hand, allowing as many class members as possible to claim benefits." *See In re: Whirlpool Corp. Front-loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *14 (N.D. Ohio Sept. 23, 2016) (internal citation omitted); Fed. R. Civ. P. 23(e)(2) advisory committee's note to the 2018 amendment ("A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."). Rule 23(e) also suggests that the parties provide the court with the anticipated claims rate and the manner in which any unclaimed settlement funds will be distributed. *Id.*

Here, there can be no doubt that the claims system under the Settlement is the most effective and feasible method of processing the claims of Direct Purchaser Settlement Class Members and distributing monetary relief to them. The Settlement provides a *pro rata* cash payment to any Direct Purchaser Settlement Class Member who files a timely and valid Claim Form, either online or via

postcard, by the Claims Deadline of September 14, 2019. (Agreement ¶¶ 1.4, 2.1.) The direct email notice contains a link to the Settlement Website where class members can submit electronic copies of the simple Claim Form online. (*See* Agreement, Exhibit B.) Paper copies of the Claim Form were also attached to each direct mail notice with return postage prepaid, and can be downloaded on the Settlement Website or requested from the Settlement Administrator by mail or telephone. (*See* Agreement, Exhibits D, E.) Of the 7,414 Claim Forms submitted to date, 1,485 were submitted online and 5,929 were submitted by U.S. Mail. (Mahan Decl. ¶ 15.)

All submitted claims have been and will continue to be processed and thoroughly vetted by Heffler. (Agreement ¶ 5.2.; Mahan Decl. ¶ 16.) Heffler has significant experience in auditing claims in class action settlements and has reviewed all submitted claims in this case with the appropriate rigor. (Mahan Decl. ¶¶ 2, 15.) Additionally, Heffler has designed the Settlement Website to prevent the filing of fraudulent claims online by requiring online claimants to provide their unique "Class Member ID" stated on their email or postcard notice to verify class membership. (*Id.* ¶ 15.)

On the other hand, Heffler will also take measures to ensure as many Direct Purchaser Settlement Class Members participate in the Settlement as possible. For example, any class member whose claim is initially rejected by Heffler will receive

a deficiency notice, which will identify all deficiencies on their Claim Form in easily understandable language and allow claimants to cure any such deficiencies with ease. (*Id.* ¶ 16; Agreement ¶ 5.2.) At bottom, the claims process here thoughtfully balances the core concerns of deterring unjustified claims and providing relief to as many Direct Purchaser Settlement Class Members as possible. *See* Fed. R. Civ. P.23(e)(2) advisory committee's note to 2018 amendment.

Based on the current participation rate of approximately 13.4% and accounting for the possibility of fraudulent claims, Class Counsel estimates—consistent with their estimate at preliminary approval, (dkt. 46 at 3)—that the final claims rate will range between 10–15%, which is typical in PPPA class action settlements and is on the high end of consumer class action claims rates in general. *See Perlin*, No. 16-cv-10635, dkt. 55 (achieving claims rate of 14% in PPPA case); *Gascho*, 822 F.3d at 290 (crediting expert testimony "that response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent[.]"). Thus, if the Settlement is approved, each Direct Purchaser Settlement Class Member who submitted an Approved Claim can expect to receive a check from the Settlement Administrator, delivered via First Class U.S. Mail, for about $60 within 60 days after the Effective Date. (Agreement ¶ 2.1.) Any checks not

cashed within 90 days of issuance will, subject to Court approval, revert to the Michigan Bar Foundation's Access to Justice Fund. (*Id.*)

Put succinctly, the claims administration process here ensures that only legitimate claimants will receive payment, encourages participation in the Settlement, and distributes significant monetary relief to the Direct Purchaser Settlement Class Members. Accordingly, this sub-factor supports final approval.

### 3. *The Terms of the Requested Attorneys' Fees Are Reasonable.*

The third sub-factor considers the adequacy of the relief provided to the class taking into account "the terms of the requested attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As explained at length in Plaintiff's Motion for Attorneys' Fees, Expenses, and Incentive Award, both the proposed method of calculating attorneys' fees and the requested percentage fee award are reasonable and predicated on the outstanding relief provided to the Settlement Classes. (Dkt. 50.) Specifically, Class Counsel requests a fee award of 35% of the $965,000 non-reversionary Settlement Fund, which is consistent with percentage awards in previous PPPA cases in this District. *See, e.g.*, *Perlin*, No. 16-cv-10635, dkt. 55 (awarding 40% of $7.4 million common fund); *Kinder*, No. 14-cv-11284, dkt. 81 (awarding 35% of $7.5 million common fund); *Moeller*, No. 5:16-cv-11367, dkt. 42 (awarding 35% of $7.6 million common fund). *Higgins*, No. 2:15-cv-13769, dkt. 81 (awarding 35% of $1.7 million common fund).

If approved, the Settlement provides that attorneys' fees will be paid within five business days after entry of the final approval order. (Agreement ¶ 8.2.) As the Sixth Circuit has recognized, in common fund cases such as this, the prompt payment of attorneys' fees is reasonable and "does not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid." *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016); *see id.* ("Quick-pay provisions are common."); *In re LivingSocial Mktg. & Sales Practice Litig.*, 298 F.R.D. 1, 22 n.25 (D.D.C. 2013) ("There is ample authority for the 'quick pay' provision.") (collecting cases); *see also In re: Whirlpool Corp. Front–loading Washer Prod. Liab. Litig.*, 2016 WL 5338012, at *21 (explaining that the quick-pay clause in no way "serv[ed] as proof that [c]lass [c]ounsel in this case somehow pursued their own interests at the expense of the class").

Since the terms of the requested attorneys' fees are reasonable and in no way affect the relief provided to the class, this third sub-factor also favors final approval.

### 4.     There Are No Agreements Outside the Settlement to Be Identified.

Finally, Rule 23(e) requires the parties seeking approval to identify any agreement made in connection with the proposed Settlement. Fed. R. Civ. P. 23(e)(2)(C)(iv). Here, apart from the terms laid out in Section 8 of the Settlement

Agreement—which relate to payment and timing of attorneys' fees, as discussed above *supra* Section V.D.3—there are no agreements made in connection with the proposed Settlement. (Scharg Decl. ¶ 14.) The Court can therefore rest assured that the written Settlement Agreement provided to the Court here and at preliminary approval represents the entirety of the Parties' proposed Settlement. (*Id.*)

Accordingly, because each factor and sub-factor identified in Rule 23(e)(2) is satisfied, the Court should confirm that the Settlement is fair, reasonable and adequate, and grant final approval.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (i) granting final approval to the Settlement Agreement, and (ii) awarding such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

Dated: July 17, 2019

**ALICE RADEN** and **BOBBIE MOORE**, individually and on behalf of the settlement classes

By: /s/ Ari J. Scharg
            One of Plaintiffs' attorneys

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Schuyler R. Ufkes
sufkes@edelson.com
EDELSON PC

36

350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Eve-Lynn J. Rapp
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596.1111
Fax: (248) 671.0335

*Counsel for Plaintiffs and the Settlement
Classes*

## <u>CERTIFICATE OF SERVICE</u>

I, Ari J. Scharg, an attorney, hereby certify that on July 17, 2019, I served the above and foregoing ***Plaintiffs' Motion for and Brief in Support of Final Approval of Class Action Settlement*** on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF filing system.

/s/ Ari J. Scharg_____